**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

**ORDER**

-against-

16 Cr 104

HOSTO DURAN,

Defendant.

-------------------------------------------------------------X

The terms of supervised release set forth in the Judgment of Conviction, dated December

21, 2016, are hereby modified to delete the words "if deemed necessary by probation" on page 4,

condition #1.  See United States v. Peterson, 248 F. 3d 79, 85 (2d Cir. 2001). See also the

transcript of today's supervised release hearing which includes (i) the pro se motion for early

termination, dated October 31, 2022 and attached hereto as Exhibit A; and (ii) the Court report

on supervised release and early termination, dated October 12, 2022, and attached hereto as

Exhibit B.

Dated: New York, New York
       December 5, 2022

_____
**RICHARD M. BERMAN, U.S.D.J.**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/6/22

Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
                                                     :
UNITED STATES OF AMERICA,                            :
                    *Plaintiff,*                     :
            v.                                       :          1:16-CR-0104-RMB-2
                                                     :
HOSTO DURAN,                                         :
                    *Defendant.*                     :
                                                     :
----------------------------------------------------x

### MOTION FOR EARLY TERMINATION
### OF SUPERVISED RELEASE

**NOW COMES** HOSTO DURAN, motioning this Court *in propria persona* (*pro se*) to

terminate the imposed term of supervised release, reducing such to a "time already

served" duration. This request is made pursuant to title 18 United States Code §3583(e)

and Federal Rules of Criminal Procedure 32.1(c). Under the same rule of criminal

procedure, no hearing is requested in this matter.


## I.    **Procedural History**

I was indicted in 2016 after accepting an Uber customer as a private client, outside the

Uber platform, and transporting them to (what I now know were) illicit drug transactions.

I was charged with Conspiracy to Distribute Controlled Substances, in violation of 18

U.S.C. §846, and eventually pleaded guilty to that count.

I was sentenced by this Court on December 21, 2016 under the punitive provisions

of 21 U.S.C. §841(b)(1)(C). That sentenced ordered me to serve 52 months in prison to

be followed by 36 months of supervised release. I served my incarceration sentence at the

Federal Prison Camp at Caanan and was then released into halfway house custody in

2020, amid the COVID-19 pandemic. I completed that term of transitional custody on

Case 1:16-cr-00104-RMB   Document 84   Filed 11/15/22   Page 2 of 16

October 2, 2020 and began my term of supervised release. I have now served two years and one month of supervision with only eleven months remaining.

I have had no issues with my supervision, have no violations of supervision (reported or non-reported), and have completed all requirements of my supervision demanded by my judgment order.

I spoke with my former supervising officer about requesting early termination, and her stance was encouraging. Paraphrased, she instructed me to "go ahead and file," and that I was "good to go." However, she has since retired and I have not yet met my new supervising officer in person. We have spoken remotely when I needed permission to travel out of state to see my kids, but I do not know if I have the support or recommendation of the U.S. Probation Office (USPO) as I did before.

## II.   This Court Has The Jurisdictional And Statutory Authority To Terminate My Supervised Release Term

This Court has original jurisdiction over this case, given by 18 U.S.C. §3231. This Court is granted the authority to terminate a term of supervised release by 18 U.S.C. §3583(e) (1), which allows a district court to "terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release after considering specific sentencing factors from §3553(a).

Pursuant to the provisions of the Federal Rules of Criminal Procedure a judge may grant early termination "… if it is satisfied that such action is warranted by the conduct of the defendant released and in the interests of justice." §3583(e)(1).

Paraphrased, the specific §3553(a) factors that are to be considered for an early termination request are: §§(a)(1): The nature and circumstances of the offense; §§(a)(2) (B): To afford deterrence to criminal conduct; §§(a)(2)(C): To protect the public from

future crimes; §§(a)(2)(D): To provide education and job training, provide medical care or other correctional treatment; §§(a)(4): The kinds of sentences available in the guidelines; §§(a)(5): In line with relevant policy; §§(a)(6): Avoiding unwarranted differences in sentence between similar defendants with similar conduct; and §§(a)(7): To provide restitution to any victims.

Conspicuously missing from this list is §§(a)(2)(A): "the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Congress' omission of this sentencing factor means it did not intend supervised release to be part of the punishment phase of sentence, but serves other intentions. The clarity given by the sentencing commission in §5D1.2 is evidence of this, which cites rehabilitation completion as a valid reason for terminating a term of supervision early.

The applicable Rule of Criminal Procedure (32.1(c)) allows the modification of supervised release terms and conditions and requires a hearing unless; (1) the relief sought is favorable to the defendant, (2) the defendant waives his right to such a hearing, and (3) that the government is notified of the modification and given a reasonable opportunity to object (Fed R. Crim. P. 32.1(2)(B) & (C)).

Committee notes to this procedural rule don't spend much time on termination requests, but bring up a defendant's right to present mitigating information when a modification request would be of greater restriction to the defendant. In this case, I both waive the hearing, and request that a decision in this matter be made without such a

hearing once the government is given an opportunity to proffer a written objection if it chooses to do so.

## III.   **Precedent Supports Early Termination In My Case**

District Courts have the authority to grant modifications of supervised release terms and conditions using their discretion. Precedent confers wide latitude in making that decision.

For many years, early termination of supervised release was considered an exceptional remedy, only "occasionally" justified. *United States v. Lussier*, 104 F.3d 32, 36 (2nd Cir. 1997). It was not warranted as part of the normal course of a sentence. *United States v. Fenza*, No. 01-CR-00921-3(ADS), 2013 WL 3990914 at *2 (E.D.N.Y. Aug 2, 2013). Simply complying with the conditions of supervision, without exceptionally good conduct or changed circumstances not contemplated at original sentencing, were not enough to warrant early termination. *Lussier* at 36, and *Fenza* at *2.

Through the last decade, precedent and policy shifted away from viewing early termination as exceptional, and began to treat it as a normal course of a sentence for many defendants. The Second Circuit itself recognized this and reversed its position on the matter from *Lussier* in 2016.

> "New or changed circumstances are not required in order to modify conditions of release, but changed circumstances may in some circumstances justify modification." *United States v. Parisi*, 821 F.3d 343, 347 (2nd Cir. 2016).

Other Circuit Courts of Appeals have since change course just as the Second Circuit did in *Parisi*. For example, the Ninth Circuit relied on *Lussier* in 2007 when affirming a district court's denial of an unopposed early termination motion in *United States v. Smith*, 219 F. App'x 666 (9th Cir. 2007). Earlier this year, that Court reversed:

> "*Smith* incorrectly attributed to the Second Circuit's decision in *United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997), the proposition that early termination is 'reserved for rare cases of exceptionally good behavior.' In fact, *Lussier* did not interpret §3583(e) to necessarily require a showing of exceptional behavior for early termination of supervised release. Rather,

the Second Circuit correctly described the district court's authority to modify the terms and conditions of supervised release under §3583(e) and observed that changed circumstances such as 'exceptionally good behavior by the defendant' may warrant termination of supervised release. The Second Circuit has since clarified that *Lussier's* holding was limited and that it '[did] not require new or changed circumstances relating to the defendant in order to modify conditions of release, but simply recognize[d] that changed circumstances may in some instances justify a modification. We take this opportunity to make clear that our unpublished disposition in Smith misread *Lussier*, and the 'exceptional behavior' rule as restated in Evertson is incorrect as a matter of law." *United States v. Ponce,* 22 F.4th 1045, 1047 (9th Cir. 2022).[1]

These decisions point toward a trend in the judiciary of seeing supervision for the utility it was originally intended to provide. Whereas, at one point, the Second,[2] Third,[3] Seventh,[4] and Ninth[5] Circuits had all required early termination to be a rare occurrence, requiring exceptional circumstances to justify the relief, each has reversed that position.

Coupled with the new language of the updated Guide to Judiciary Policy, Vol. 8 Part E (Post-Conviction Supervision)[6] §360(c), this stance is not simply more-aligned with the original design of supervised release, it conforms to the current policy conclusions of the U.S. Sentencing Commission and Judicial Conference. This is discussed in greater detail below (regarding factor §3553(a)(5)).

In sum, early termination of supervised release was never intended to be imposed in most cases, but only those that need it. Later it became so routinely used that, currently, essentially every felony sentence with more than one year in prison includes a term of supervised release. However, terminating that term once its purpose is served should be, and is beginning to be, a routine conclusion to a supervision term.

---

1   Footnote 2 in *Ponce* also affirms that the Third Circuit decision in *Melvin* "corrected a similar misreading of *Lussier*." *Id.* (citing *United States v. Melvin,* 978 F.3d 49 (3rd Cir. 2020)).

2   In *Parisi.*

3   In *Melvin, supra* at footnote 6.

4   In *Kappes.*

5   In *Ponce, id.*

6   Transmittal 080-40, July 2, 2018.

Page 5

## IV.   **Statutory Factors Support Early Termination In My Case**

Primarily, 18 U.S.C. §3583(e)(1) requires a district judge to consider whether or not an early termination request, such as this one, is in the interests of justice. To determine what the interests of justice, themselves, are, one must look to the sentencing factors contained in §3553(a).

It's important to note here that the cross-reference factors for modification of supervised release terms intentionally omit §3553(a)(2)(A) and (a)(3). These omission directly correlate to Congressional intent when creating supervised release in the Sentencing Reform Act of 1984. Incarceration was intended to serve the punitive interests of justice, while supervised release was reserved for other, rehabilitative intents. Therefore, factor (a)(2)(A) does not apply here.

Further, supervision modifications under §3583(e) are altogether different than sentencing decisions. Due process is curtailed for revocation proceedings, as the standard of evidence/proof there is a preponderance, not beyond a reasonable doubt (as it is at trial). §3583(e) is a separate kind of proceeding, one which is distinct from sentencing decisions and different even from §3582(c) decisions. This is why factor (a)(3) is also missing and, as a result, the limitations on sentencing decisions from mandatory minimums and plea stipulations do not apply.[7]

Ignoring these omitted factors, the interests of justice as outlined by the remaining §3553(a) factors are served by granting early termination. All eight remaining factors support early termination as serving the interests of justice.

## Nature, Circumstances, History, Character

To begin, the nature and circumstances of my offense, along with the history and characteristics of the defendant (me), both encourage early termination here. I was sentenced below the applicable/calculated guidelines range in this case because my role in the instant offense was minimal, my criminal history was marginal, and because I took

---

[7]   See *United States v. Vargas*, 564 F.3d 618 (2nd Cir. 2009). (Citing *United States v. Spinelle*, 41 F.3d 1056 (6th Cir. 1994)). See also United States v. Trotter, 321 F.Supp. 3d 337, 360 (E.D.N.Y. 2018) (quoting Pope v. Perdue, 889 F. 3d 410, 141 (7th Cir. 2018).

immediate responsibility for my actions. Those actions promoted the illicit drug trade and I cannot undo those actions.

However, by the time I was sentenced I had turned 40 years old and I was married with two children, and a host of friends and extended family who advocated for me. Doc. 74 at 4-5. Friends and family flooded the Court with letters advocating for sentence leniency, which the Court found "remarkably demonstrated" my strong family ties and work history. *Id.*

> "Each of these letters described the defendant as a good, hardworking man, who takes care of his family and is a man who was greatly affected by the passing of his father." *Id.* at 5, ln. 23-25.

I cannot change or take back my actions, actions which brought me into the supervision term that I now seek to terminate. I can, however, demonstrate to the Court the character my family and friends described in those letters. I believe I have done so, and that early termination is appropriate under this factor.

### Recidivism

The concern for recidivism is paramount in relation to supervised release, and especially so when considering whether or not to terminate a supervision term. Not only are two separate sentencing factors contemplate recidivism risk, but the Sentencing Commission's only example of a defendant appropriate for early termination is one who has reduced his recidivism risk.

I have shown already that I am fully capable of living a lawful life, fully self-managed. So far, I have spent 25 months on supervised release without single reported violation. Additionally, during time between sentencing and today, the accusations of fraud against me (beginning during my time on pretrial supervision) proved meritless and the charges stemming from those accusations were dropped.

This is trouble-free time period is significant. Several studies have shown that about half (47%) of offenders who will have their supervision terms revoked will do so in

the first 12 months after release.[8]

The passage of time means more than simply the amount of time spent on supervision for recidivism. As offenders get older, their risk of re-offending decreases in nearly direct proportion. Controlling for criminal history is even more illuminating: my statistical chance of re-offending, according to a 2021 Sentencing Commission study, has decreased by nearly 10% from the date of my indictment date to today.[9]

Today, my statistical risk for rearrest over a 9 year period is <u>30%</u> lower than the average released (male) federal offender.[10] That same study analyzed the effects of other metrics on recidivism and found that offenders, like me, with at least *some* college education are rearrested 15% less often than average.[11]

While statistical findings like these do not compound, or "stack", it is still true that my chance of rearrest or even re-conviction today is far below the federal average. Moreover, because I have completed the treatment and counseling requirements of my judgment order, my post-release rehabilitation is complete and my recidivism chance is further diminished.

### Correctional Treatment Goals

As briefly mentioned above, my Judgment Order contained a special condition, requiring that I participate in weekly therapeutic individual counseling by a licensed therapist, if it is deemed necessary by the USPO. Doc. 72 at 4 (Special Condition 1).

I was so directed by my probation officer and attended those weekly sessions for more than a year. Before my release, I took advantage of dozens of programs offered by the Bureau of Prisons (BOP), many of which are well-known to reduce recidivism.

These program completions not only satisfy the interests of justice for this factor, but support early termination as serving the interests of justice for factor (a)(5) as well.

---

8  Alper, Durose, and Markman, *2018 Update on Prisoner Recidivism: A 9-year Follow-up Period (2005-2014);* (2018) DOJ – Bureau of Justice Statistics. That number jumps to 82% in the first 36 months.

9  Cotter, Semisch, and Rutter, *Recidivism of Federal Offenders Released in 2010*; (2021) U.S. Sentencing Commission. pg 30, Table 4.

10  52.3% average for all studied male offenders released in 2010 vs. 22.3%

11  *Id.* at 31, Table 5.

Those considerations are discussed in the policy factor section, below. Here, however, it suffices to demonstrate that I have no further correctional treatment needs remaining.

## The Ranges of Recommended Sentences

The Sentencing Commission's Guidelines Manual makes two, seemingly contradictory sentencing recommendations when it comes to supervised release. First, it recommends longer sentences being imposed (originally), as a reaction to the Supreme Court decision prohibiting longer *incarceration* sentences meant to facilitate rehabilitation programs.[12]

> "The guidelines encourage…[courts] to exercise [early termination] authority in appropriate cases, particularly noting that a court may impose a longer term of supervised release on a defendant with a drug, alcohol or other addiction, but may then terminate the supervised release term early when a defendant successfully completes a treatment program, thereby reducing the risk to the public from further crimes of the defendant." *Primer: Supervised Release;* (2019) United States Sentencing Commission, Office of General Counsel.

Despite this policy application, encouraging the high-end of sentences for supervision, the Guidelines Manual suggests that supervision sentences between one and three years are appropriate for Class C & D felonies. My conviction here is within this definition, because 21 U.S.C. §841(b)(1)(C) sets a statutory maximum prison sentence at 20 years. See 18 U.S.C. §3559(a)(3).

Therefore, the two years I have now served falls well within the established sentencing ranges for my sentence, and early termination here would not be outside those established ranges.

## Policy Considerations – Sentencing Commission Policy

As touched upon in the section above, the Sentencing Commission's policy on supervised release begins with the encouragement to impose longer terms of supervision at original sentencing. This is meant to provide ample time for a defendant to undertake (and

---

12 *Tapia v. United States,* 564 U.S. 319 (2011).

complete) necessary rehabilitation and treatment. This is offset by the Commission *also* encouraging early termination from those longer terms once rehabilitation (and recidivism reduction) efforts are complete.

To highlight this, the explicit policy of the Sentencing Commission regarding early termination of supervised release drives this point home.

> "The court is encouraged to exercise this authority in appropriate cases... For example, the court may wish to consider early termination of supervised release if the defendant is an abuser of narcotics, other controlled substances, or alcohol who, while on supervised release, successfully completes a treatment program, thereby reducing the risk to the public from further crimes of the defendant." U.S.S.G. §5D1.2 App.n. 5.

My participation in, and completion of, the weekly therapy sessions assigned to me by my former probation officers places me within the category of offender the Sentencing Commission deems an "appropriate case" for early termination.

This isn't the only applicable policy of the Commission regarding early termination, however, in relation to my case. The sheer number of courses I completed during my four-plus years in prison actually triggers another policy that recommends heavy consideration of early termination.

Previously used for inmates who were too late in their sentence to fully take advantage of retroactive reductions in base offense levels (from newly-enacted Guidelines Amendments), §1B1.10 App N. 7(B) addresses inmates who, in retrospect, spent too much time in prison.

> "Modification Relating to Early Termination. – If the prohibition [] relating to time already served precludes a reduction in the term of imprisonment to the extent the court determines otherwise would have been appropriate as a result of the amended guideline range ... the court may consider any such reduction that it was unable to grant in connection with any motion for early termination of a term of supervised release under §3583(e)(1)" *Id.*

I was incarcerated when the First Step Act was passed in late 2018. That law enacted new calculations for good-conduct credits and added time-credit awards for completion of

specific recidivism-reducing programs.[13] The full list can be found on the BOP website, and I've included the table of contents of that document, listing all of those programs, as Exhibit 1.

While I was released in 2020, those time-credits were fully implemented by the BOP in January of this year, meaning I was eligible for, but could not take advantage of them. The complete list of programs I finished during my time in the BOP is available in my probationary file. I, however, do not have a complete set of those completion certificates. I do know that many of those programs now earn time-credits I did not receive, making me eligible for the considerations of this policy as well.

## Policy Considerations – Judicial Conference Policy

One further policy affects decisions on early termination, and that policy comes from the Judicial Conference – Committee on Criminal Law. Now titled "Post-Release Supervision", this was formerly known as "Monograph 109: Supervision of Federal Offenders" but was re-titled it's July 2018 revision (Transmittal 08-040, July 2, 2018).

This new policy recommends two sets of factors depending on how long the defendant has been on supervised release when requesting early termination. Those two sets are for defendants before and after the service of 18 months on supervised release.

> "For a defendant who requests early termination after serving 18 or more months of supervised release, "there is a presumption in favor of recommending early termination" for persons who meet the following criteria:
>
> > (1) The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism;
> >
> > (2) The person presents no identified risk of harm to the public or victim;
> >
> > (3) The person is free from any court-reported violations over a 12-month period;
> >
> > (4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision;

---

13  See First Ste Act Approved Programs Guide; (July 2022) USDOJ – BOP. Available at
https://www.bop.gov/inmates/fsa/docs/fsa_program_guide_2201.pdf .

Page 11

(5) The person is in substantial compliance with all conditions of supervision; and,

(6) The person engaged in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision." *Monograph 109 "Post-Conviction Supervision"* §360.20(c).

This change to the recommendation criteria of the pre-2018 Judicial Conference Policy on "Post-Conviction Supervision" is significant. It moves:

"from coercing a person to act lawfully to monitoring and fostering a persons ability to self-manage lawful behavior and desire to act lawfully. In light of these changes and to advance the policy underlying them, this Court will rely upon §360.20 [post-2018 revision] of the Judicial Conference's policy regarding postconviction supervision for guidance as to whether early termination is warranted." *United States v. Shaw,* 445 F.Supp.3d 1160, 1164 (D. Colo 2020)

As is easily shown here, I am not a career offender, a sex offender, and I pose no very little risk to the community of future criminal re-offense. I have served over one year of supervised release and committed no new crimes.

I have a fantastic, supportive, and encouraging prosocial support network of family and friends. I have steady income from my various driving jobs and have proven to this Court that I can be very resourceful in my ability to find and maintain work in many different areas.

I have committed no violations of supervision in the entire term of supervised release served thus far, not just the last 12 months, and I have a completed all requirements of my judgment order. For certain, I have proven to the Court that I can live and maintain a lawful life, fully self-managed, long passed the period of supervision.

## Preventing Sentence Disparities

I've already shown how my current term of supervised release followed a prison sentence that was longer than it should have been, based solely on the timing of my incarceration.

A disparity exists there between my case and defendants sentenced today. Another

consideration for sentencing disparities are other cases which are similar to my own, where the defendant was granted early termination of supervised release. For example, in *United States v. McFadden,* No. 2:06-CR-693 (E.D.N.Y., December 5, 2016), Defendant McFadden was convicted of cocaine distribution and was released by judge Spatt after service of 1 year and 3 months of supervised release.

See also *United States v. Pequero,* No. 1:08-CR-823 (S.D.N.Y. March 26, 2021) where judge Broderick released Defendant Pequero after he had served three years of his five-year term of supervised release. Hon. Broderick considered successful reintegration into the community as well as a spotless record on supervision to be "exceptional conduct," under the *Lussier* standard.

Defendant Michael Rose petitioned for early termination in a cocaine importation case. *United States v. Rose,* No. 1:17-CR-12, (E.D.N.Y. May 17, 2019). There, Defendant Rose had served just over three years of supervised release when he was released from further supervision by Hon Ann M. Donnelly. More cases exist beyond these which illustrate my point on disparity, but discussing each of them would be repetitive. For further inquiry, see *United States v. Sousa,* No. 1:10-CR-001-LEK (N.D.N.Y. Nov. 6, 2017) *United States v. Pollard,* No. 2:05-CR-16 (E.D.N.Y. Oct. 30, 2017), *United States v. Minaya,* No. 1:15-CR-549 (S.D.N.Y. May. 24, 2021), *United States v. Santiago,* No. 1:11-CR-569-2 (S.D.N.Y. May. 19, 2021).

Considering these cases, granting early termination here would not create a harmful sentencing disparity.[14]

---

14  §3553(a)(7) does not apply because I was not given a fine or restitution to pay.

Page 13

## V.   **Conclusion**

For the reasons stated herein, the interests of justice are served by granting early termination in my case. For the reasons stated herein, my conduct warrants early termination in this case.

Because the interests of justice and my conduct both support a granting of this motion, I pray this Court agree and discharge me from further supervision.

Signed this <u>31st</u> day of October, 2022.

*Hosto Duran*
HOSTO DURAN
[Address withheld per FRCP 49.1]
Bronx, NY 10473
Defendant in *pro se,* Movant

## VI.   **Compliance And COVID-19 *Pro Se* Filing Procedures**

This pleading is not written in letter-motion format, as I am the defendant in this case. As such, I am not a practicing attorney in the Southern District of New York and I do not have access to the EM/ECF system for filing. However, this document conforms to L.R.Crim.P. 49.

Insofar as COVID-19 adjusted procedures allow, this motion is filed in "paper copy" pursuant to the "Notice to Pro Se Litigants" filed by this Court on July 7, 2020 via e-mail to Temporary_Pro_Se_Filing@nysd.uscourts.gov. Additionally, I declare that signed for, and agree to, receive e-mail notifications under that same notice with the accompanying Consent Form. That Consent Form was, likewise, filed with the temporary *pro se* e-mail address above.

As ECF participants, opposing counsel has consented to service by electronic means.

Page 14

VII.  **Exhibit 1: BOP Programming Statement On First Step Act Time-Credit-Earining Programs (Table Of Contents Only)**

# TABLE OF CONTENTS

| EVIDENCE BASED RECIDIVISM REDUCTION (EBRR) PROGRAMS | # |
|---|---|
| ANGER MANAGEMENT | 4 |
| APPRENTICESHIP TRAINING | 5 |
| ASSERT YOURSELF FOR FEMALE OFFENDERS | 6 |
| BASIC COGNITIVE SKILLS | 7 |
| BRAVE* | 8 |
| BUREAU LITERACY PROGRAM | 9 |
| CERTIFICATION COURSE TRAINING | 10 |
| CHALLENGE PROGRAM* | 11 |
| COGNITIVE PROCESSING THERAPY | 12 |
| CRIMINAL THINKING | 13 |
| DIALECTICAL BEHAVIOR THERAPY | 14 |
| EMOTIONAL SELF-REGULATION | 15 |
| FEDERAL PRISON INDUSTRIES | 16 |
| FEMALE INTEGRATED TREATMENT (FIT)* | 17 |
| FOUNDATION | 18 |
| ILLNESS MANAGEMENT & RECOVERY | 19 |
| LIFE CONNECTIONS PROGRAM | 20 |
| MENTAL HEALTH STEP DOWN PROGRAM* | 21 |
| MONEY SMART FOR ADULTS | 22 |
| MONEY SMART FOR OLDER ADULTS | 23 |
| NATIONAL PARENTING FROM PRISON PROGRAM | 24 |
| NON-RESIDENTIAL DRUG ABUSE PROGRAM | 25 |
| POST-SECONDARY EDUCATION | 26 |
| RESIDENTIAL DRUG ABUSE PROGRAM (RDAP)* | 27 |
| RESOLVE PROGRAM | 28 |
| SEEKING SAFETY | 29 |
| SEX OFFENDER TREATMENT PROGRAM NON-RESIDENTIAL | 30 |
| SEX OFFENDER TREATMENT PROGRAM* | 31 |
| SKILLS PROGRAM* | 32 |
| SOCIAL SKILLS TRAINING | 33 |
| STAGES PROGRAM* | 34 |
| THRESHOLD PROGRAM | 35 |
| VOCATIONAL TRAINING | 36 |
| WOMEN'S BASIC FINANCIAL LITERACY PROGRAM | 37 |
| WOMEN'S CAREER EXPLORATION SERIES | 38 |
| STRUCTURED, CURRICULUM-BASED PRODUCTIVE ACTIVITIES | 39-49 |
| BOP INSTITUTION INDEX | 50-51 |
| RDAP LOCATIONS | 52 |

*RESIDENTIAL (MODIFIED THERAPEUTIC COMMUNITY)

Exhibit B

# Court Involved Supervised Release

# October 2022 Update

© 2022 Richard M. Berman, U.S.D.J.

October 12, 2022

**Executive Summary**

In this report, we provide results from our court involved supervised release project. Data and case studies are presented from the perspectives of recidivism and desistance from crime—in the areas of rearrest, return to prison, and early termination of supervision.

The Study Population rearrest rates over three and five years are **17.1%** and **20.4%**, respectively; the return to prison rate is **13.2%**; and the early termination rate is **46.2%**. These results include all Study Population supervisees and make no adjustments for "risky" supervisees.

Acknowledging that comparisons are at best imprecise, we include an AO study which shows rearrest rates of **20.8%** at three years (**16.3% adjusted**) and 27.7% at five years (page 20); a Bureau of Justice Statistics study which shows a return to prison rate of **31.6%** (page 22); and an AO early termination study which shows a rate of **18.8%** (page 34).

The approach and outcomes presented in our report are very encouraging. At the same time, it is premature to conclude or to celebrate that recidivism is decreasing (page 8).

A fair conclusion to be reached from the data and the case studies is that judges who become actively involved in supervision—together with dedicated probation officers and others—can unequivocally and meaningfully assist supervisees to safely and successfully reenter their communities.

# Table of Contents

I.      Introduction ........................................................................................................1

II.     Illustrative Case Studies .....................................................................................2

III.    Government Recidivism Studies ..........................................................................6

IV.     Court Involvement in Supervised Release ..........................................................10

V.      Recidivism Metrics ...........................................................................................18

        Re-Arrest ...................................................................................................... 18

        Rearrest Outcomes......................................................................................... 20

        Return to Prison ............................................................................................ 22

        Revocation ..................................................................................................... 23

VI.     Early Terminations............................................................................................29

VII.    Desistance .......................................................................................................36

        Family Support .............................................................................................. 37

        Housing.......................................................................................................... 40

        Employment ................................................................................................... 41

        Mental Health and Substance Abuse ............................................................ 42

        Physical Health.............................................................................................. 45

VIII.   Magistrate Judge Sarah Cave on Court Involved Supervised Release .................47

IX.     Conclusion .......................................................................................................49

I. **Introduction**

Since 2016, my chambers staff and I have been actively involved in supervision of all those persons I had sentenced to incarceration and who are in the supervised release phase of their criminal case(s). The goal is to make a positive difference in reentry outcomes. To do this, I convene regular "supervised release hearings" which include the Court, the supervisee, the probation officer, defense counsel, the AUSA, and, increasingly, therapists and treatment providers. The hearings are supplemental to the vitally important work of the SDNY Probation Department and its tireless probation officers who remain the backbone of supervision. Supervised release hearings are open to the public and are transcribed.

Our Study Population consists of 152 persons who were sentenced by me and who had at least one supervised release hearing during the five-year period from January 1, 2016 to December 31, 2020. We have included our results in written reports, dated April 6, 2021, September 2, 2021, and April 20, 2022. This is our fourth report and update.[1]

We focus upon outcomes in the context of the vexing problem of repeat offending, and related factors such as mental health, substance abuse, housing, employment, and family and community support. At pages 47-49 we include the viewpoint of SDNY Magistrate Judge Sarah L. Cave whose recent involvement in our project suggests a potentially viable approach to scaling up court involvement in supervised release—so that **every** Federal supervisee can receive the attention and support necessary to achieve safe and successful reentry.

---

[1] As of December 31, 2021, there were in the United States approximately 108,000 persons on Federal supervised release. *See* Table E-2—Federal Probation System Statistical Tables For The Federal Judiciary (December 31, 2021), https://www.uscourts.gov/statistics/table/e-2/statistical-tables-federal-judiciary/2021/12/31. **The average length of supervision is 51 months or 4.25 years**, according to the U.S. Sentencing Commission report entitled *Recidivism of Federal Offenders Released in 2010*, published September 30, 2021.

It cannot be emphasized enough that comparisons of supervision outcomes are often imprecise. "Because varied measures are used to determine recidivism, it is difficult to compare recidivism rates between [and among] studies . . . ." James L. Johnson, Probation Administrator, Administrative Office of the U.S. Courts, *Comparison of Recidivism Studies: AOUSC, USSC, and BJS*, 81 Fed. Probation J. 52, 54 (2017). Studies vary significantly in methodology, size, time, and duration, and comparable data and statistics are not always collected and/or analyzed.

It should also be noted that while we sometimes focus upon traditional recidivism factors such as rearrests, returns to prison, and revocations, we are equally cognizant of other important approaches such as "desistance" from crime. "Desistance refers to why and how people stop committing crime. The key distinction between recidivism and desistance approaches is that the former focuses on a negative outcome (i.e., crime at a discrete point in time), whereas the latter seeks to track positive outcomes that may result in reduced involvement in offending over time, ultimately leading to the complete cessation of criminal behavior." Richard Rosenfeld et al., *The Limits of Recidivism: Measuring Success After Prison* at 79 (Nat'l Academy Sciences 2022).[2]

At pages 29-36 we report that **46.2%** of our Study Population supervisees have earned "early termination" of supervised release, pursuant to 18 U.S.C. § 3583(e). This is a significant number, and we present data derived from these early termination cases and highlight factors which go hand in hand with successful reentry, as for example, that **93%** of our supervisees who received early termination were also employed.

**II.    Illustrative Case Studies**

We utilize case studies throughout this report to reflect our approach to supervised release.

---

[2] "[T]he complex, iterative, and multidimensional processes of desistance and reintegration help us apply and test theories regarding *why* and *how* reentering individuals persist in, or desist from, criminal activity." *Id.* at 115.

<u>**Case Study #1**</u>

The supervisee (an entertainer) was sentenced in 2018 to time served followed by 3 years of supervised release for conspiracy to distribute and possess with intent to distribute cocaine. The conditions of his supervised release included participation in a substance abuse program, weekly therapeutic counseling, and community service. He began supervision in 2018.

<u>**May 2020 Hearing**</u>

**Court**: We have had, in this case, historically good reports. In particular, [supervisee] has, among other things, regularly engaged in therapeutic counseling and also has been helpful to Puerto Rico following their natural disasters. In the report . . . from Probation . . . you can see pictures which reflect that work that he is doing to help his community.

**Probation Officer**: [Supervisee has] completed 180 hours of community service work. Since January 2020, Puerto Rico has been having major earthquakes, shakes, and the aftermath of the shakes. [Supervisee's] maternal family is from the south side of the Island. He has been very committed to this part of the island and providing food to the people who still are sheltered there, first aid assistance, water. . . .

He has [attended his] therapy sessions virtually . . . . They are connecting through video calls. . . . [The therapist] has no concerns right now regarding any relapse . . . . She has very positive feedback [about supervisee]. . . .

He has never tested positive to the use of controlled substances and all his drug tests are unannounced.

**Supervisee**: My family is well. They are healthy. I've been keeping an eye on my parents, my grandfather. I've been working from home [in] the studio – we have a studio in my own home for working with music. . . . [A]rtists are giving concerts [since the COVID pandemic started]. We are streaming them. We are doing that for free.

<u>**June 2021 Hearing**</u>

**Probation Officer**: [Supervisee] is doing very good during this process. He continues his therapy sessions. We are using the telephone modality to continue his therapy. But [beginning] this month, now we are going to provide the therapy sessions in person. The drug testing has been negative. There is no concern in therapy of any relapse or any triggers that might result in relapse. His cognitions are extremely positive. There is no concern in the community of negative associations. . . . [Supervisee's therapist] is recommending that his treatment be

completed and satisfied, because the objectives of treatment have been completed.
. . .

He continues his motivational speeches through his social media account, Instagram. We have joined his speeches and there is very good information that he provides. The public, his followers, are very excited and they motivate him . . . . He talks about different kinds of things, some life experience, music experience. He also sometimes has people as invitees [and] they also talk about the importance of positive associations.

**Court**: That is the way . . . we agreed with you to fulfill your community service obligation, and I think it is really terrific. . . . [A]re your followers aware . . . of [your] prior history involving use of substances . . . and is that a positive lesson that [you are] helping to teach?

**Supervisee**: Yes, of course. I use my past mistakes to present positive encouragement, and I receive many blessings from doing things right like this.

### August 2021 Hearing

**Probation Officer**: Your Honor . . . we consider all issues regarding a person under supervision: Treatment, use of controlled substances, periods or amount of time in sobriety, feedback from his therapist. . . . His feedback from his therapist was always very good. [Supervisee] has been, during therapy, very communicative, very honest, very open. There is no indication regarding use of controlled substances. During his supervised release term, he has been tested over 30 times, all unannounced, and he always has negative to controlled substances. He has been very open, agreeable to our home contacts and the community contacts. . . . [B]ased on that information, we recommend early termination . . . .

**Supervisee**: I've learned a lot through this process, a lot of discipline. I'm committed to fulfill my obligations in terms of facing the law. I'm very appreciative for you allowing me to be part of this hearing by phone.

**Court**: The purpose of supervision is to get beyond the arrest and whatever crime had been committed and to integrate the person back into the community. [Supervisee] has done that remarkably well, including his community service during supervision, during which he took the opportunity as pretty much a motivational speaker to talk to his fans and others about what he's learned from the whole process. . . .

[I]t seems to me [that] a great deal of support that [supervisee] received [was] from his family, including his parents who are on the phone today. I think they deserve a lot of credit for helping in this outcome.

So, because [he] has conducted himself in an exemplary and law-abiding fashion and, in fact, he might be said to have exceeded the requirements of his supervision, I'm very pleased to terminate supervision . . . .

4

### Case Study #2

The supervisee was sentenced in 2010 to 57 months of incarceration followed by 3 years of supervised release for being a felon in possession of a firearm. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2014.

### May 2021 Hearing

**Court:** Our last hearing . . . . probation had very positive things to say about [supervisee], that he was on . . . a "great track," and . . . that he was doing phenomenally well. . . . He was at that time unemployed . . . although he was interested in seeking employment. He was also seeking vocational training . . . .

**Probation Officer:** [Supervisee] continues to do pretty well. He has continued to test negative for substances . . . . He remains compliant with his treatment . . . . He continues to reside with his mom.

He is due to begin . . . vocational training in the hopes of obtaining certification in plumbing in the coming weeks. . . . So we are hopeful that after he begins a vocational training program we can have employment lined up for him . . . .

**Therapist:** [Supervisee] comes in every two weeks, every other week we have a tele-health session. He is very much motivated to attend treatment, he is doing well. He doesn't report any issues. I don't have any concerns with him. He is very motivated to continue on the right path and work towards his future.

**Supervisee:** I think things [are] going pretty good. I am just following the road map . . . . I am going to school for vocational training and then hopefully I will have a full-time employment after the vocational training.

### September 2021 Hearing

**Court:** I think you're doing a good job. And I just think we should continue on this path and at some appropriate time . . . we would entertain an early termination application . . . . you're doing just what you need to be doing, and I'm proud that you are . . . .

### July 2022 Hearing

**Court:** [T]he probation department has made a formal written request seeking early termination of supervised release . . . . [and] also advises that all parties are amenable to an early termination. . . .

Probation also reported that [supervisee] graduated from the vocational program he was participating in and received a certificate as an electrician helper. . . . [and] that [he] was seeking employment assistance through his vocational school.

**Probation Officer**: Since he commenced supervision . . . he has been generally compliant. He has actively attended treatment. . . .

[H]e has promising employment prospect[s]. He's been offered jobs on more than one occasion. . . . [H]e has a plan, and I trust that . . . ready to enter the employment world and support himself and his child. . . .

**AUSA**: The supervisee is free from any court reported violations over a 12-month period, he has a stable residence, he appears to have a plan, in terms of obtaining employment. He has gotten a number of certificates. . . . His toxicology tests have been [negative]. He's been in compliance with all the standards of supervision. He also appears to have a good support base, a good motive, particularly in looking out for his daughter. And for all those reasons, the government would support an early termination of supervised release.

**Supervisee**: I'm [ ] ecstatic . . . . I had to grow up inside of prison . . . . So I'm just so happy, because it makes me feel . . . liberated in a certain kind of way . . . . I got my daughter . . . [and] she's extreme motivation for me to just keep pushing forward, do the right thing . . . .

I think probation helped me a lot, and especially the therapeutic sessions . . .

**Court**: I happily grant the application for early termination . . . . And we're going to wish you – and we all do wish you – the best of luck.

## III.    Government Recidivism Studies

Repeat offending is obviously a major concern of our communities and of our criminal justice system. It has been a focus, for example, of the Administrative Office of the U.S. Courts ("Administrative Office" or "AO"), the U.S. Sentencing Commission ("Sentencing Commission"), and the Department of Justice Bureau of Justice Statistics ("Bureau of Justice Statistics"). According to two high ranking AO Probation and Pretrial Services Office officials, "the men and women exiting federal prisons continue to be rearrested at an unacceptable rate." Scott Anders & Jay Whetzel, *The Reconstruction of Federal Reentry*, 34 Fed. Sentencing Rep. 282, 282 (June 2022).

Three leading governmental studies of recidivism are as follows:

(i) A study by the Sentencing Commission, dated September 30, 2021, which considered 32,135 Federal offenders who, following incarceration, began supervision in 2010. In this study,

the Sentencing Commission discusses rearrests for felonies and misdemeanors as well as rearrests "for alleged [technical] violations of supervised release, probation, or state parole" as principal measures of recidivism. U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* at 6 (Sept. 30, 2021) ("2021 Sentencing Commission Report"). The study concludes that "[t]he recidivism of federal offenders has remained constant. Nearly half (**49.3%**) of offenders released in 2010 were rearrested within the eight-year follow-up period. **This rate is identical to the rearrest rate (49.3%) for federal offenders released in 2005**." *See* 2021 Sentencing Commission Report at 20 (emphasis added).

(ii) A report published by the Bureau of Justice Statistics in June 2016 which examined 42,977 Federal offenders who had commenced supervised release in 2005. The Bureau of Justice Statistics measures recidivism by rearrests for felonies, misdemeanors, and technical violations of supervision, and also by returns to prison.[3] U.S. Department of Justice Bureau of Justice Statistics, *Recidivism of Offenders Placed on Federal Community Supervision in 2005: Patterns from 2005 to 2010* at 12-13 (June 2016) ("2016 BJS Report"). The BJS found that **43%** of supervisees were rearrested within five years of commencing supervision and that **35%** were rearrested within three years. *See id.* at 3.

(iii) A report published by the Administrative Office in December 2015 which studied 454,223 Federal offenders who commenced supervised release between the years 2004 and 2014. The AO report employed two metrics in measuring recidivism: (i) rearrest for "felony offenses"

---

[3] The 2016 BJS Report defined a "return to prison" as "an arrest [state or federal] within 5 years of being released from a federal prison in 2005 that resulted in a return to prison. . . . A return to prison may result from an arrest for a new crime or a technical violation of a condition of release . . . ." 2016 BJS Report at 11. *See* page 22.

and (ii) "revocation of supervision".[4] *See* Laura M. Baber, Probation and Pretrial Services Office, *Administrative Office of the U.S. Courts, Inroads to Reducing Federal Recidivism,* 79 Fed. Probation J. 3, 4-5 (Dec. 2015) ("2015 AO Recidivism Report"). The AO found that "**20.8** percent [of supervisees] were rearrested within three years [of the start of supervision]; and less than 30 percent have a rearrest within five years (**27.7** percent)." 2015 AO Recidivism Report at 5.

The 2015 AO Recidivism Report also included what it termed are "adjusted rates." The purpose of the adjusted rates is, according to the AO, to reflect the "inherent risk of the offender population." *Id.* at 4. That is, adjustments had been employed, according to the AO, because "**persons who enter federal supervision each year are at increased risk to recidivate,**" causing a "**gradual upward pressure on rearrest and revocation rates.**" *Id.* at 5, 7 (emphases added).[5] The AO reported an adjusted (downward) three-year rearrest rate of **16.3%** for supervisees who commenced supervision in 2011, as compared to **20.8%** on an unadjusted basis. *Id.* at 7. (The AO did not report an adjusted five-year rearrest rate.) And, the AO concluded, after adjusting for "inherent risk of the offender population," that "**recidivism . . . is decreasing.**" 2015 AO Recidivism Report at 4 (emphasis added).

---

[4] "For purposes of this study, arrests are defined as the first arrest for a serious offense that occurs for a supervisee. Minor offenses are excluded from the statistics." 2015 AO Recidivism Report at 5. "Serious offenses are felony offenses." *Id.* at 5 n.6.

Revocation "generally refers to the judicial act of canceling [supervised release] in response to the offender violating the terms of supervision, and imposing a term of incarceration." Glossary of Sentencing Terms, U.S. Sentencing Commission website (last visited Oct. 12, 2022).

[5] The AO found that "between FY 2005 and FY 2011, the average AO Post Conviction Risk Assessment (PCRA) score of a newly-received supervisee rose from 5.09 to 6.55, an increase of 1.46 points. Other data support that the federal supervision population **is increasing in risk**, due certainly in part to more extensive criminal histories of those convicted of federal crimes. As illustration, the criminal history score of defendants who began supervision in FY 2005 increased from 4.61 to 5.62 in FY 2015." 2015 AO Recidivism Report at 5 (emphasis added).

Some observers believe that the AO conclusion that recidivism is actually decreasing is highly debatable. For example, while "correctional practice among U.S. Probation officers nationally has progressed greatly . . . . these efforts have apparently **not** led to reductions in recidivism for the men and women leaving federal prison." *See* Anders & Whetzel (2022) at 285 (emphasis added). Certainly, the AO's unadjusted rates do not support the idea that recidivism is falling. *See* 2015 AO Recidivism Report at 7 ("Unadjusted, rearrest rates have remained steady").

Chart 1 below shows rearrest rates reported by the AO, the Sentencing Commission, and the Bureau of Justice Statistics.

### Chart 1: Rearrest Rates (Government Agencies)



**AO Risk Assessment Measure**

The Administrative Office bases the degree and level of supervision by probation officers upon what is called the Federal Post Conviction Risk Assessment ("PCRA"). PCRA seeks to determine a supervisee's risk level "by the presence or absence of criminogenic factors, which are personal characteristics and circumstances statistically associated with an increased chance of recidivism." Administrative Office of the U.S. Courts Probation and Pretrial Services Office, *An Overview of the Federal Post Conviction Risk Assessment* at 4 (June 2018) ("PCRA Overview"). According to the AO, "the level of correctional intervention should match the client's risk of recidivism. Higher risk persons require more intensive services to reduce reoffending, while lower risk persons need less intervention." PCRA Overview at 3-4. "The Administrative Office's research indicates that, with each increase in risk category, the probability of rearrest increases." *Id.* (emphasis added).

Risk assessment in the context of criminal conduct seems (more) complicated. And, for example, while risk assessment tools may "provide us with insights about groups of people," they "reveal far less about individuals." Vincent Southerland, *The Intersection of Race and Algorithmic Tools in the Criminal Legal System*, 80 Md. L. Rev. 487, 527 (2021).[6]

IV.   **Court Involvement in Supervised Release**

Our supervised release program includes **all** defendants sentenced to incarceration, irrespective of their criminal history, risk assessment, mental health, substance abuse, employment, age, etc. At the initial hearing, the Court makes clear that supervised release is **not** intended principally to be about punishment, as follows:

---

[6] Also, the Court respectfully suggests that it would be very helpful if the AO were to publish precisely what, if any, services probation officers are providing to supervisees in the various risk categories.

10

**May 13, 2020 Hearing**

(1) **Court:** "This is our first supervised release hearing. . . . Just so you know what to expect, supervised release is intended to be a period of time and a program and process which [ ] endeavors to be of help to persons who have been incarcerated and now are out and [to] help you adjust if need be and [to provide] any services that we as the Court and the Probation Department . . . can provide."

**February 3, 2022 Hearing**

(2) **Court:** "Let me say a few words about what I think about supervised release. I think it's a very important phase of [the] criminal case. In fact, I think it's perhaps the most important. [M]y hope is that we – in this supervision phase – can get beyond punishment and that all of us focus on successful and safe reentry into the community. . . . Everybody has a role to play . . . ."

As mentioned, our supervised release proceedings include the Court, the supervisee, the probation officer, the prosecutor, the defense attorney, and, very often, the treatment provider. Each hearing usually covers these topics: case background as described by the Court; actions taken by the Court at the last hearing; compliance with the terms and conditions of supervised release; comments and insights of the supervisees and the service providers, including therapists and drug counselors; and applications, including, for example, those pertaining to early termination.

At the heart of each hearing is a dialogue between and among the Court, the supervisee, and the other parties concerning housing, community and family adjustment, mental and physical health, drug treatment, employment, and goals and objectives of supervision, *i.e.*, "where do we go from here." Hearings may include testimony and written exhibits. The supervisee is at all times represented by counsel (usually by the same attorney who represented the supervisee up to and including sentencing). The Court convenes the first hearing with each supervisee soon after release from prison or the halfway house and often within 30-45 days of release. Thereafter, the Court

11

holds hearings on an as-needed basis, *i.e.*, more hearings when a supervisee is having difficulty and fewer hearings when things are going smoothly.

During the COVID-19 pandemic, we conducted many supervised release hearings "virtually" in place of in-person hearings in the courtroom. Virtual hearings greatly increase efficiency and convenience and lower the cost and expenses to the supervisees (and to the other parties). Quite apart from the obvious cost reductions, time savings, and less wear and tear on supervisees, virtual hearings are at least as "genuine" as in-person proceedings, if not more so. *See* PEW Charitable Trusts, *How Courts Embraced Technology, Met the Pandemic Challenge, and Revolutionized Their Operations* (Dec. 1, 2021) ("The boost in [proceedings] that followed the shift to virtual hearings is consistent with pre-pandemic assertions that reducing the day-to-day costs of coming to court—such as transportation, child care, lost wages, and travel time—would increase people's ability to meaningfully engage in court cases.")

Chart 2 below shows the number of supervised release hearings conducted each year from 2016 to 2021.

## Chart 2: Total Number of Supervised Release Hearings by Year



Charts 3, 4, and 5 below reflect level of education, criminal history category, and PCRA risk categories of supervisees in our Study Population.

### Chart 3: Level of Education



### Chart 4: Criminal History Category (I through VI)



Note: Category I reflects the lowest level of criminal history; Category VI is the highest level.

13

**Chart 5: U.S. Probation Department's PCRA Risk Categories
(as Assigned to 123 Study Population Supervisees)[7]**



Supervised release hearings foster a close collaborative effort between and among the stakeholders. *See* Edward Latessa, Shelley L. Johnson & Deborah Koetzle, *What Works (and Doesn't) in Reducing Recidivism* at 160 (2d ed. 2020). "[I]t is important that all team members are active and knowledgeable participants in the process." *Id.* at 168. The hearings facilitate the Court's active interaction with the supervisee. *See* Jacob Schuman, *The Judicial Role in Supervision and Reentry*, 34 Fed. Sent'g Rep. 318, 318 (June 2022) ("Judges and courts play a key role in federal community supervision."). They "allow[] time for the judge to inquire about progress, give meaningful feedback, [encourage,] and address concerns that may arise," and to develop an atmosphere of candor and trust. *See* Latessa et al. (2020) at 166-67. The research suggests that "feeling supported by the judge is an important element of success," and that "strong

---

[7] PCRA data was not available for 29 additional supervisees in the Study Population.

leadership from an effective judge" is important to achieving successful reentry. *See* Shannon M. Carey et al., *Reentry Court Research: Overview of Findings from the National Institute of Justice's Evaluation of Second Chance Act Adult Reentry Courts* at 24 (2018). In my experience, supervisees are almost always very eager to interact with the judge.

Here are two examples of our supervised release hearings.

### Case Study #3

The supervisee was sentenced in 2012 to 95 months of incarceration followed by 5 years of supervised release for racketeering and attempted assault in aid of racketeering. The conditions of supervised release included participation in a substance abuse program and weekly therapeutic counseling. Supervision began in 2016.

> **Court**: [W]e have a report . . . from Probation. . . . I'll make it Court Exhibit A to today's hearing. We were last together at a hearing [in] August. . . . What's happened since then from Probation's point of view?
>
> **Probation Officer**: So, your Honor . . . his father was struggling with cancer for a few years and, you know, that stress I believe, you know, affected [supervisee]. . . . [Supervisee's] father did pass away.
>
> **Court**: I'm sorry to hear that.
>
> **Probation Officer**: [Supervisee] goes four times a week to [co-occurring substance abuse and mental health treatment] sessions. . . . He goes in once a week to get tested and the other sessions are conducted via zoom through [ ] telehealth. . . .
>
> **Court**: So your overall assessment is [that] he's doing very [well]?
>
> **Probation**: Yes, so right now I would like him to just continue his four weekly sessions. . . .
>
> **Court**: All right. So [supervisee], what's your take on how things are going?
>
> **Supervisee**: I just -- you know, I went through a lot in the last couple of weeks. . . . [My father] went in for a screening and he -- out of nowhere, he got cancer in his bones. . . . My counselor . . . had moved on, and I had such a good relationship with him. I really didn't know how to deal with it, I'll be honest with you. . . . I just started fresh with [my new counselor], and . . . I really didn't know how to talk to him . . .

**Court**: I don't think that is surprising. Has it improved with him?

**Supervisee**: Of course, a hundred percent. . . . I mean, he got me through it. . . . [My father was] just waiting to die, he was suffering, I kind of like was forced to open up to [my new counselor] and he took it from there. . . .

**Court**: I got it. All right. . . . Let's keep on this path, it seems to me. . . . There is no doubt in my mind that you're committed and sincere and you're taking full advantage of these programs. So, that's all I can ask or anybody can ask. So, I just hope that things continue to get better for you. . . .

Work is good it sounds like, right? You have plenty of work to do?

**Supervisee**: Well, right now I do because this is the busiest part of the year . . . . Other than that, I have two small children, two girls. I mean, the holidays are going to be busy for me anyway, plus everything that's going on with my family, so I'm mostly – I'm mostly busy. I'm mostly with my mother and I'm mostly by my mother's house now.

**Court**: I got it. And at home, the kids are OK and [your partner] is OK?

**Supervisee**: They're perfect. The kids are supersmart. My 10-year-old is on the dean's list. . . . And my 3-year-old just started pre-K. . . . My fiancée is working from home . . . . It's all working out the right way.

**Court**: From my point of view . . . you're doing very well.

**Supervisee**: Yes. Totally different relationship than before I got sentenced, right, [Judge] Berman? I was kind of nervous coming home and then running into you again. I didn't know. It was a totally different approach from you to me. . . . I was kind of scared because of how all the sentencing went, and now I understand about the drug treatment you put me in. And . . . it's kind of good that I didn't get – I didn't get just put home and no treatment was done, and that would have been more of a problem with my relapse.

**Court**: Yes. I'm glad to hear it. Everybody is doing the best they can, including me and you, and so that's all anybody can ask.

### Case Study #4

The supervisee was sentenced in 2003 to 210 months of incarceration followed by 3 years of supervised release for distribution and possession with intent to distribute narcotics. The conditions of supervised release included participation in a substance abuse program and weekly therapeutic counseling. Supervision began in 2020.

16

**Court**: During our last hearing [we learned] that [supervisee's] state court matter had been dismissed, which was a very good, positive sign. The [substance abuse] counselor . . . participated in the last hearing, and she reported that [supervisee] actively participates in weekly individual sessions. That was also a good sign. In addition, it was reported that the last drug test that [supervisee] had back in July was negative for illicit substances, so that was also good. And [supervisee] was working full time.

**Drug Counselor**: Since we last met, unfortunately, [supervisee] was let go from his job. There were some issues with his schedule, and he missed one day. But then I guess the following week everyone was laid off from the job. . . . Since then, we have kept him with his schedule of doing two individual [counseling sessions] with me. He meets with his peer recovery coach, and then he is . . . doing groups on Saturdays via telehealth, and he has been doing pretty well with the schedule. . . .

[W]hen we spoke [last], he subsequently had a couple of positive toxicologies. . . . He was able to be sober from all substances since then, so . . . he has been negative for substances for the past three weeks. He is showing up [for] his appointments. . . .

I worked with him on getting him an [employment services] intake, so he did do an intake with them. . . . [O]verall, I would say the past three weeks have been really positive, and I don't see any issues at this time.

**Supervisee**: I'm grateful [for my] counselor because she is very easy going and easy to talk to and very helpful and resourceful. So it helps me to open up because we don't just sit there and talk about addiction. We talk about life and life's terms and anything that happens to be on my mind. And she shares also. It opens up more doors for me and, you know, I'm glad to have her [attend] these conferences on my behalf because, lord knows, I need all the help I can get. . . . Eventually one day I want to get this over with, your Honor. I can say the only thing that I am going to miss is, if and when or whenever I get off [supervision], is not being able to talk to you. . . .

**Court** [to drug counselor]: What has to happen here? . . . Do we need a plan or have you a plan in mind . . . ?

**Drug Counselor**: Well, my plan is to start the process with the supportive housing route because I don't think it would be the wisest thing just to release [supervisee] off with no services in place. . . .

**Court** [to supervisee]: Where are you living now?

**Supervisee**: I'm in the halfway house.

**Probation Officer**: [Supervisee] completed the four months that was court ordered for him at the halfway house in September [of] this month . . . . And we have extended it . . . . just [as] a place to hold his bed there until . . . we can find suitable housing. . . .

But I'm really grateful to [the drug counselor] for working with him as well because she is providing him services that are not just for [his] current situation, but also for the future, which would provide him with the home that he needs. It's kind of like a sober living environment, so it would be very, very good for him to reside at.

But, overall, with [employment services] assisting him with vocational training and job leads and job readiness, I feel like right now he has all the tools that he needs to succeed, and it would be wonderful for him . . . to secure a bed for December . . . . [And,] as we get closer to hopefully entertaining early termination . . . .

## V.   Recidivism Metrics

### Re-Arrest

The term "rearrest" refers, in this context, to an arrest that occurs during the term of supervised release. Rearrest is "the primary measure of recidivism used by federal agencies in recent recidivism studies." *See* 2021 Sentencing Commission Report at 6. The Administrative Office, the Sentencing Commission, and the Bureau of Justice Statistics each use rearrest to measure recidivism on the basis that "arrest is the most valid measure of frequency of offending that can be gained from official data sources." David Weisburd & Chester Britt, *Statistics in Crim. Justice* at 24 (3d ed. 2007); *see also* 2021 Sentencing Commission Report at 6; 2015 AO Recidivism Report at 4; 2016 BJS Report at 1. An arrest is said to be "much closer in occurrence to the actual behavior [agencies] seek to study and are not filtered by the negotiations found at later stages of the legal process." Weisburd & Britt (2007) at 24.

In calculating our Study Population rearrest rate, we include rearrests for state and federal felonies but we do not include rearrests for misdemeanors or for technical violations of

18

supervision.[8] This is similar to the approach taken by the AO.[9] *See* 2015 AO Recidivism Report at 5. The AO points out that (1) "states vary in their practices regarding the extent to which misdemeanor and petty offenses are reported"; and (2) "[a]rrests for technical [supervised release] violations are not indicative of new criminal behavior, but rather reflect an offender's failure to comply with certain conditions of his or her supervision, such as testing positive for illegal drugs, failing to complete substance abuse treatment, or traveling outside of the area without prior permission." Johnson (2017) at 53.

The Sentencing Commission and the Bureau of Justice Statistics take a somewhat different approach in that they include as rearrests not only felony arrests but also arrests for misdemeanors and for technical violations of supervision. *See id.* **As a result, the Sentencing Commission and the Bureau of Justice Statistics "always show a higher level of recidivism than the AO,"** thus making direct comparisons among the three agencies difficult. *See* Nora Demleitner, *The U.S. Sentencing Commission's Recidivism Studies: Myopic, Misleading, and Doubling Down on Imprisonment*, 33 Fed. Sent'g Rep. 11, 15 (2020).

In past reports, we included the percentage of supervisees in the Study Population rearrested on federal or state felony charges during the term of supervision. We did not—until now—report three- and five-year rearrest rates.

---

[8] To identify felony rearrests, we reviewed our case files for each supervisee and, as a cross check, we reviewed data generated by the U.S. Probation & Pretrial Services Automated Case Tracking System ("PACTS").

[9] The AO defined rearrest as "the first arrest for a serious offense that occurs for a supervisee. Minor offenses are excluded from the statistics. . . . Serious offenses are felony offenses." 2015 AO Recidivism Report at 5.

**Chart 6: Re-Arrests**



Chart 6 includes the Study Population's three-year and five-year rearrest rates as of October 11, 2022. It shows that **17.1%** of the Study Population (or 26 supervisees) were rearrested on (state or federal) felony charges within three years of the start of supervision; and **20.4%** (or 31 supervisees) were rearrested on felony charges within five years of starting supervision.

Chart 6 also includes rearrest rates reported by the AO. It shows that **20.8%** of Federal supervisees were rearrested on (state and federal) felony charges within three years of the start of supervision; and **27.7%** were rearrested on felony charges within five years of starting supervision. Chart 6 also includes the AO's **adjusted** three-year rearrest rate of **16.3%**.

**Rearrest Outcomes**

It is important also to consider the fact that not all arrests result in conviction or incarceration and, therefore, that "rearrests can overstate recidivism." 2021 Sentencing

Commission Report at 6; *see also* 2016 BJS Report at 1 ("[O]f those persons arrested, a smaller percentage are charged, and an even smaller percentage are imprisoned."). Simply stated, rearrest rates do not reliably reflect "legal confirmation of criminal conduct." Demleitner (2020) at 15.

**Chart 7: Felony Re-Arrest Outcomes (RMB Study Population)**



Chart 7 reflects actual dispositions of the felony (re)arrests incurred by supervisees in the Study Population. Of the 48 felony arrests, **35.4%** led to dismissal; **8.3%** resulted in a guilty plea and a sentence that did not include incarceration; **8.3%** resulted in a guilty plea and a sentence of less than 9 months of incarceration; and **18.8%** resulted in a guilty plea and a sentence of between 9 to 97 months of incarceration. **29.2%** of felony rearrests remain unresolved. It is also important to observe that **79.6%** of all supervisees in the Study Population (*i.e.*, 121 supervisees) were **not** arrested on felony charges during supervision.

**Return to Prison**

"Return to prison" (or "reincarceration") is used by the Bureau of Justice Statistics to measure recidivism. *See, e.g.*, 2016 BJS Report at 7, 11. The 2016 BJS Report analyzed 42,977 Federal offenders who commenced supervised release in 2005. A "return to prison" was defined as an "arrest[] that resulted in a prison sentence during the 5-year follow-up period." *Id.* at 11. To be included as a return to prison, an arrest must have (i) occurred within five years of release from prison; and (ii) resulted in a prison sentence. *See id.* In calculating a Study Population return to prison rate, we used the same definition used by the Bureau of Justice Statistics.

Chart 8 reflects that **13.2%** of the Study Population (or 20 supervisees) were returned to prison within five years of the start of supervision for a new crime or a technical violation of supervised release that led to a new sentence of incarceration. Chart 8 also includes the Bureau of Justice Statistics five-year return to prison rate of **31.6%** for offenders released in 2005.



### Chart 8: Return to Prison

**Revocation**

Revocation of supervision is sometimes used to measure recidivism. *See* 2015 AO Recidivism Report at 4. According to the U.S. Sentencing Commission, revocation "generally refers to the judicial act of canceling the supervision in response to the offender violating the terms of supervision, and imposing a term of incarceration." Glossary of Sentencing Terms, U.S. Sentencing Commission website (last visited Sept. 8, 2022). Revocation, according to the AO, is sometimes said to be "the final effort by the court to disrupt a supervisee's escalating noncompliant behavior that will lead to crime and more harm to the community." 2015 AO Recidivism Report at 6. The 2021 Sentencing Commission Report and the 2016 BJS Report do **not** include revocation rates.

This Court is skeptical about the utility of revocation and has not concluded that revocation is or should often be the end to supervision. For one thing, it may well be appropriate to avoid revocation, particularly where revocation would leave the supervisee adrift and without the benefit of necessary services, such as mental health or substance abuse treatment. For another, revocation and related concepts of "cancelation" and "final efforts" are at odds with the objective of helping supervisees to safely and successfully reenter the community. There is no official time limit by which reentry must be accomplished. Third, revocation may be akin to cutting off one's nose to spite one's face. If supervisees are "cut loose" because they are difficult to supervise, the community may suffer the consequences.

Another weakness of revocation as a recidivism metric is the absence of uniformity. Revocations are "subject to court culture and probation officer influence." Some courts revoke supervision in situations where other courts would not. *See* 2015 AO Recidivism Report at 4. And, the meaning of revocation is not altogether clear. 18 U.S.C. § 3583(e) provides that district courts have authority to "terminate," "extend," or "revoke" a term of supervised release "after considering

23

the factors set forth in section 3553." But the statute does not define "revoke" or "revocation."

Indeed, revocation is said to be a "relic" of the parole system which was replaced in 1984 by

supervised release. *See* S. REP. 98-225.

> The term "revoke" appears to be somewhat of a misnomer. Parole was based on early release from prison—by the grace of the parole board a person was conditionally released from prison, and the leniency could be "revoked." [By contrast,] a person on supervised release has completed his or her prison term and is serving an independent term of supervision separately ordered by the court. Supervised release is not being "revoked"; rather, a supervisee is being punished for violating conditions [of supervision] . . . .

*United States v. Trotter*, 321 F. Supp. 3d 337, 346 (E.D.N.Y. 2018) (Weinstein, D.J.) (internal

citation omitted).

In April 2022, we reported that 22 supervisees in the Study Population (or **14.5%**) had

their supervision "revoked." *See* April 2022 Study Population Update at 20. These revocations

most often followed adjudication of a violation where revocation was by statute "mandatory." *See*

18 U.S.C. § 3583(g).[10] Since then, 3 additional supervisees have had their terms of supervised

release revoked, bringing the percentage to **16.4%**. None of these supervisees was dropped from

supervision, *i.e.*, their sentences included a new term of supervised release.

### Case Study #5

The first of three Study Population supervisees pleaded guilty in state court to criminal

possession of a firearm which constituted a Grade B violation of supervision. The supervisee had

also fled from the police. On August 1, 2022, some 34 months into the supervisee's original 3-

---

[10] "Upon a finding of a Grade A or B violation, the court shall revoke probation or supervised release . . . ." U.S.S.G. § 7B1.3. If the supervisee: (i) "possesses a controlled substance"; (ii) "possesses a firearm . . . in violation of Federal law"; (iii) "refuses to comply with drug testing"; or (iv) "tests positive for illegal controlled substances more than 3 times over the course of 1 year," he or she is subject to "mandatory" revocation. 18 U.S.C. § 3583(g).

year term of supervision, this Court sentenced the supervisee to 12 months' imprisonment and to

6 additional years of supervised release.

> **Court**: [Supervisee] pled guilty . . . [in state court to] criminal possession of a weapon in the second degree. . . . in satisfaction of no less than 17 outstanding violation specifications.
>
> [Supervisee] has a substance abuse history and . . . ha[s] issues with alcohol, Percocet and other drugs. . . . [His] "special conditions" included weekly therapeutic counseling by a licensed therapist and substance abuse treatment and testing. . . . So we're not yet succeeding with [supervisee]. . . . [We] have not made a dent, it seems to me, in some serious issues, personal issues, which I know he has, and which require serious mental health treatment and also drug counseling. . . .
>
> **Defense Counsel**: [Supervisee] has now been in jail for [almost] three years. I'm hoping that that has had an effect on him. Of course, he needs to get a job, get a stable life, follow the directions of Probation, get the counseling he needs, and stay away from the streets. . . .
>
> **AUSA**: I think we should note that this is not an entirely hopeless cause. . . [Supervisee] did actually have a job, I believe he was loading trucks . . . . [Supervisee committed a] fairly egregious breach of trust of having gone back [to crime] . . . .
>
> I did want to encourage the Court . . . that any sentence should certainly include a significant period of supervised release. I think this Court in particular, this Court's particularly attentive approach to supervised release, has produced good results in a lot of cases . . . .
>
> **Court**: It's my judgment that [Supervisee] be committed to the custody of the Bureau of Prisons to be imprisoned for a term of 12 months, that term is consecutive with his state sentence of incarceration. . . . [and] six years of supervised release following his release from incarceration. The six years is concurrent with any parole the state may be doing.

### Case Study #6

The second of three Study Population supervisees admitted to seven Grade C violations of

supervised release, including three counts of use of a controlled substance, three counts of failure

to participate in substance abuse treatment, and one count of failure to enter residential treatment

as directed by the Court. On March 29, 2022, some 44 months into the supervisee's 5-year term

of supervision, the Court sentenced the supervisee to "time served" (253 days) and 2 additional

years of supervised release, which included inpatient treatment for mental health and for substance abuse disorders.

> **Court**: This sentence has been adjourned several times . . . with the very purpose of determining the best course of treatment, as opposed to additional punishments, and [supervisee] and everybody else acknowledged issues of mental health and drug addiction. And that would include . . . the immediate transfer to [an inpatient treatment facility] for approximately 28 days followed by placement at [a facility] for long-term care. . . .

> During that time and during the 28-day period, he would be detoxed and remain detoxed . . . and he would be treated by medical doctors in connection with his . . . addictions and also treated on a mental health basis.

> **Probation Officer**: Yes, your Honor. They have all of the professional staff to detox and work on rehabilitation during that time frame.

> **Court**: This proposed arrangement . . . comes at the end of a very long and intense period of time of all of us working with [supervisee] with a lot of ups and maybe a similar amount of downs. . . .

> **Defense Counsel**: As [supervisee] has said over and over again, he's more than 50 years old now. He does have contact with family. He cares about himself, but he also cares about them. And he wants a better life. . . . He wants a treatment program here.

> **Court** [to supervisee]: What's your view of all this? I need to know that you are 100 percent committed to this plan . . . .

> **Supervisee**: I'm ready, your Honor. Like you said, everybody has helped me out. . . . I want to be [at the inpatient treatment facility]. I want to leave that place, be graduated, successful certificate, have my mental health ready, kick this drug habit and, you know, not have urges at all. I want to leave [ ] that place happy, your Honor. I want to be able to tell my daughters that I really made it, I'm successful.

> **Court**: Several of these specifications require mandatory revocation of supervision . . . .

> I'm sentencing [supervisee] to time served, which is . . . somewhere between six and seven months [of incarceration]. . . . I am revoking the current sentence of supervision and imposing in its place an additional term of supervised release of two years . . . . the principal conditions of which are that [supervisee] comply with the rules and regulations of both [initial inpatient treatment and] long-term care.

<u>Case Study #7</u>

The third of these three Study Population supervisees admitted to four Grade C violations of supervised release, including failure to abide by the conditions of the halfway house, leaving the district without permission (and absconding for one year), failure to comply with location monitoring (by cutting off his GPS ankle monitor), and use of a controlled substance. On September 1, 2022, some 38 months into the original 5-year term of supervision, the Court sentenced the supervisee to 12 months' imprisonment followed by 5 years of additional supervised release.

> **Court:** During the July 26th, 2022 hearing . . . the probation officer . . . noted that he had been a probation officer for 23 years and he had never seen anyone given as many chances as [supervisee] . . . in this case.
>
> **Defense Counsel:** [Supervisee is] addicted to drugs . . . . [H]e had a $200 to $300 [per day] Percocet habit. And as I understand addiction, whether he is released today or [in] 10 months, his problem and his past and [his] battle is exactly going to be the same.
>
> **Court:** [T]his is a common problem. . . . [People] don't really often understand what supervised release entails . . . especially where there is a co-occurring disorder, which includes both drug addiction and mental health issues . . . . It is a matter of serious, intensive work with a professional . . . . [It's] a difficult assignment. . . .
>
> I think we have a track record here that compels some amount of residential treatment at the outset. I think that if we don't . . . we're going to be back here sooner rather than later. . . .
>
> **Probation Officer:** We would [recommend] the maximum [sentence under the policy guideline range] of 13 months [imprisonment].
>
> **AUSA:** The government would recommend a guidelines sentence [of 7 to 13 months imprisonment]. . . .
>
> [Y]our Honor . . . made sure that he would be released directly to a rehabilitation center and made very clear that [supervisee] should spend a full year in that center so that he could reenter successfully. And he utterly failed at that. He was discharged unsuccessfully after only a few months because he was disobeying the rules constantly, insolent, breaking curfew, possessing contraband, getting into fights with staff. . . .
>
> **Court:** [I]t is my judgment that [supervisee] be committed to the custody of the Bureau of Prisons and to be imprisoned for a term of 12 months . . . .

I'm revoking . . . the current supervision – and in its place, upon release from incarceration, I'm imposing a new term of supervision of five years. . . . [Supervisee will] be released into an inpatient program for drug abuse and co-occurring mental health treatment for six months at a minimum. . . .

### Chart 9: Revocation of Supervised Release



Chart 9 reflects that **15.1%** of the RMB Study Population (or 23 supervisees) had their supervision revoked within five years of being released from prison. And, **7.2%** (or 11 supervisees) had their supervision revoked within three years of being released from prison. Chart 9 also includes revocation rates reported by the AO. The 2015 AO Recidivism Report analyzed 454,223 Federal supervisees who commenced supervision between 2004 and 2014. The AO reported that **26.0%** of these supervisees had their supervision revoked within five years; and that **21.9%** had their supervision revoked within three years of commencing supervision. *See* 2015 AO Recidivism Report at 6.

The AO also presented revocation rates **"that are adjusted for inherent risk of the offender population,"** which included an **adjusted** three-year revocation rate of **15.7%** for

persons who commenced supervision in 2011. *Id.* at 4, 7; *see also* discussion of AO's adjusted rates at pages 8-9. The AO did not provide a five-year adjusted revocation rate.[11]

## VI.   Early Terminations

Early termination is an important statutory incentive (and reward) for supervisees who succeed during supervision. The Court grants (or denies) early termination applications on a case-by-case basis—and only after considering the safety of the community and whether the conditions of supervised release have been satisfied. The Court is encouraged by the high percentage— **46%**—of Study Population supervisees who have earned early termination of their supervised release. *See* 18 U.S.C. § 3583(e) ("The court may . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice.").

Early termination enables supervisees to exit the criminal justice system. It rewards positive behavior, saves taxpayer money, and enables the government to redirect resources to other supervisees. **"Research shows that policymakers can maximize limited resources and maintain public safety by reducing the length of supervision of certain offenders and prioritizing oversight and services for those most likely to reoffend."** The PEW Charitable Trusts, *Number of Offenders on Federal Supervised Release Hits All-Time High* at 3 (Jan. 24,

---

[11] The Sentencing Commission has published revocation rates in a report on supervised release violations. *See* U.S. Sentencing Commission, *Federal Probation and Supervised Release Violations* at 12 (July 2020). The report found that **16.2%** of all Federal supervisees had their supervised release revoked in 2015; and **18.4%** had their supervised release revoked in 2017. *Id.* The Sentencing Commission revocation rates were estimated by dividing total "violations . . . in which the court ordered the supervision revoked" into the total number of Federal supervisees for each year of the study, without regard to how far into the term of supervision the revocation occurred (*i.e.,* the Sentencing Commission did not calculate three-year or five-year revocation rates). *See id.* at 17.

2017) (emphasis added). The AO has described early termination as "presumptive" and as "a positive incentive for persons under supervision and as a measure to contain costs in the judiciary **without compromising the mission of public safety**." *See* Laura Baber & James Johnson, Administrative Office of the U.S. Courts, *Early Termination of Supervision: No Compromise to Community Safety*, 77 Fed. Probation 17, 17 (Sep. 2013) (emphasis added).[12]

In our supervised release project, we have been able to grant early termination in **46%** of cases. Chart 10 below contrasts our results with the AO's early termination rate of **18.8%** for 2006-2012. Most importantly, we grant early termination when all the stakeholders—*i.e.*, Probation, the government, defense counsel, service providers, and the Court—conclude that early termination is merited. *See* discussion of **92.6%** unanimity in early termination decisions at page 33 below.

---

[12] The SDNY Probation Department's early termination policy also states as follows:

"The appropriateness of early termination should be based on the releasee's compliance with all conditions of supervision and overall progress in meeting supervision objectives or making progressive strides toward supervision objections specific to the releasee that exhibit stable community reintegration (*e.g.*, residence, family, employment, health, social networks) during the period of supervision and beyond.

Officers should consider the suitability of early termination for releasees as soon as they are statutorily eligible. *A determination of suitability for early termination should be addressed and documented at the first annual case plan (at the 18 month-mark) and not less than yearly thereafter. Lower risk cases should be given special consideration and priority for early termination. . . .*" SDNY Probation Office Policy re: Early Termination from Probation and Supervised Release (March 5, 2018) (emphasis in original).

According to the AO, "[a]t 18 months there is a presumption in favor of recommending early termination for persons who meet the following criteria: 1) The person does not meet the criteria of a career drug offender or career criminal (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or engaged in terrorism; 2) The person presents no identified risk of harm to the public or victims; (3) The person is free from any court-reported violations over a 12-month period; (4) The person demonstrates the ability to lawfully self-manage beyond the period of supervision; (5) The person is in substantial compliance with all conditions of supervision; and (6) The person engages in appropriate prosocial activities and receives sufficient prosocial support to remain lawful well beyond the period of supervision." 8E Administrative Office of U.S. Courts, Guide to Judiciary Policy, Probation and Pretrial Services, Supervision of Federal Offenders §§ 360.20(c) (2018).

The following two examples reflect our early termination practices.

### Case Study #8

The supervisee was originally sentenced in 2016 to 18 months of incarceration and 3 years of supervised release for financial aid fraud. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2018.

> **Court:** [T]his is a hearing that I have been looking forward to in this case. . . . [B]ased on the materials and the record of [supervisee] during his term of supervised release, I feel very optimistic with respect to [supervisee] and his future.
>
> **Probation Officer:** [Supervisee] has maintained continuous contact with the probation office and myself. He has continuously tested negative, and he has provided documentation on his [new business] venture. . . .
>
> I also spoke with his treatment counsellor who informed me that [supervisee] continues his sessions, he has never missed any, he continuously engages and finds therapy very beneficial to himself, especially during . . . COVID and with the health concerns of his family. But I was also informed that [supervisee] will continue to seek therapy after supervised release is over . . . .
>
> [Supervisee] has been very compliant, he has been very forthright, and at this time I have no issues with [him].
>
> **Supervisee:** [W]ith COVID shutting us all down last March to where we are today . . . I have found our every-other-month communication, our [hearings] very beneficial. I'm very grateful to you . . . to [] allow these conferences to actually help me pivot and move forward with my career, and I have found you a very valuable resource . . . . I have learned a lot . . . .
>
> [G]oing back to my time [in prison], I literally found myself at times as a morale booster for the other [] inmates . . . because we were on lockdown several times. . . . I was using my entertainment experience to entertain them. We had talent shows that I helped co-produce with the guards and with the warden. I also . . . had a job in the [prison] education department, and I was actually running it for the last three months that I was there. And as a result, I developed courses and I got people, two inmates, their GED. . . .
>
> So I decided to develop [a new company] as my platform, my online platform, to continue further discussions of things like cancer and

alternative healthcare and cardiac care, geriatric care. . . . And just in general everything seemed to come together, and I thought that, by virtue of what I had done [in prison], I was able to transfer that into a much more productive situation . . . .

**Defense Counsel**: Every time we have appeared in front of [the Court], [supervisee] was uplifted. As defense counsel, you can imagine how uplifting that is to me, to have this exemplification of empathy and concern for him. Every single solitary time for him to look forward to his court appearances has really just been remarkable and has uplifted me as well . . . . I am reaffirmed in my faith in the courts, in the justice system.

**Court**: [Supervisee's] supervised release [is] terminated early because he did all the right things and made all the right moves. . . . [M]y sincerest wishes for your good luck and good health and success out there in the community . . . .

### Case Study #9

This supervisee was originally sentenced in 2014 to "time served" and 10 years of supervised release for felon in possession of a firearm and dealing firearms without a license. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2014.

**Court**: So at [the previous] hearing it was reported that things were going well for [supervisee] in the sense that he was gainfully employed; indeed, at the time he had two jobs, one at [a restaurant] and another at a company . . . which does floor restoration. . . .

There was an issue in [another state] which I understand has since been dismissed, a domestic violence allegation. And since that incident [supervisee] has come back to New York. . . .

[Recently] defense counsel requested, with the consent of the government and probation department, that the court terminate his supervision [early].

**AUSA**: Supervision has been going well since 2018 when he went to inpatient [treatment]. . . . I think that we look at the entire course of conduct here since [he] started being supervised in 2011. And other than that one incident . . . which as your Honor noted has been dismissed, [supervisee] has been, as probation likes to put it, amenable to supervision and, indeed, has excelled at various points and at various capacities. So I think that's the justification for

probation and the government joining the recommendation [of early termination] . . . .

**Probation Officer:** [Supervisee] successfully completed his court-ordered treatment. . . . [S]ince that time, I think he's been making progress. He's continued to maintain his employment. . . . I think moving forward [supervisee] has the tools that he obtained in treatment and in the event that he would need some further assistance in the future he would know how to obtain that.

**Defense Counsel:** When your Honor . . . sentenced him . . . he went out to [another state] to live near his family. And for three full years there were nothing but good reports coming . . . for the whole of 2015, 2016, and 2017. Now, the wheels did come off the bus a bit in the beginning of 2018 and [supervisee] was drinking a lot and he was arrested for domestic violence. Your Honor brought him back here. And he underwent a full year of inpatient treatment for alcohol abuse and for anger management. . . . I believe that he really got a lot out of those [programs]. . . . [Supervisee] has excelled in finding employment. . . . His work ethic and his real desire to strive and do better is so evident at this point that we thought that it might be time for him to . . . be terminated from supervised release and be on his own.

**Supervisee:** Your Honor, it's been a long road, many years. And I relapsed. That won't happen again. I stay focused. I stay away from people, places and things. My focus is my life and my family. I'm a hundred precent sure I'm ready, your Honor.

**Court:** [You are] being rewarded [ ] with almost a halving of a ten-year term of supervised release down to five-plus [years] because [you have] fulfilled the obligations placed upon [you]. . . . this is the end result of [your] good work.

It is important to emphasize that in **92.6%** of cases the decision to grant early termination was made by unanimous consent of all the relevant parties.[13] The government and/or the Probation Department opposed early termination in only 4 instances or **7.4%** of all early terminations.

---

[13] With respect to the government, we consider an early termination decision to be unanimous where the government "deferred" to the positive recommendation of Probation and the Court.

Chart 10 below shows the Study Population's current early termination rate of **46.2%**. The rate is calculated by dividing the total number of early terminations (54) by the total number of terminations (117).

### Chart 10: Early Termination Rate (RMB Study Population)

50%

46.2%

44.2%

40.7%

34.1%

30%

**April 2021**     **September 2021**     **April 2022**     **September 2022**

Chart 11 below reflects our current early termination rate side by side with the early termination rate reported by the AO for all Federal supervisees during the years 2006 to 2012. *See* Baber & Johnson (2013) at 18. More recent AO early termination data was not available.

### Chart 11: Early Termination



34

We hasten to add that, while early termination is a very positive objective and accomplishment, "normal course terminations" also reflect a successful term of supervised release. "Normal course termination," as used here, means expiration at the end of the term of supervision imposed. "As a general rule, a case is classified as a 'successful' closure if the term of supervision expired **or** was terminated without revocation." U.S. Sentencing Commission, *Federal Offenders Sentenced to Supervised Release* at 61 (July 2010) (emphasis added).[14]

Chart 12 below reflects that early terminations plus normal course terminations in the Study Population together support a "success" rate of **94.9%** (46.2% + 48.7%).



**Chart 12: Successful Termination(s) of Supervision
(RMB Study Population)**

---

[14] Our normal course terminations include 10 terminations that occurred at the conclusion of an extended term of supervision.

Chart 13 below shows that among all successful terminations of supervision, 8% occurred within two years of the start of supervision; 51% occurred two to four years into the term of supervision; 32% occurred four to six years into the term of supervision; and 8% occurred six or more years into the term of supervision.

### Chart 13: Years of Supervision Prior to Successful Termination (RMB Study Population)



## VII.   Desistance

While "[t]he historical emphasis on recidivism . . . reflects, in part, a desire by researchers and institutions to establish a common 'success rate' indicator," the focus on recidivism "fail[s] to capture the real changes that people returning from incarceration experience." Rosenfeld et al. (2022) at 79. As a result, recidivism is "limited as a performance measure or metric for success." *Id.*

Desistance refers to "the process of abstaining from crime by those with a previous pattern of offending." *See* Desistance – General Practice Principles, HM Inspectorate of Probation (last updated Dec. 18, 2020). It is "neither a quick nor easy process . . . . It can take considerable time, potentially many years, to change entrenched behaviours and the underlying problems." *Id.; see also* Jeffrey Fagan, *Cessation of Family Violence: Deterrence and Dissuasion*, 11 Crime & Just.

377, 420 (1989) ("Desistance may be a process as complex and lengthy as the processes of initial [criminal] involvement."). "[B]ecause cessation or reduction in criminal behavior often occurs as a part of a gradual process that may involve setbacks, measures of desistance from crime can offer a more accurate, complete, and nuanced account of an individual's reduction in criminal activity than do measures of recidivism." Rosenfeld et al. (2022) at 115. Desistance metrics include such factors as family and social (community) support, employment, housing, and mental and physical health. *Id.* at 195.

In our Study Population, we see correlations between desistance and successful reentry into the community particularly (but not only) among those supervisees who have achieved early termination and who have worked their way out of the criminal justice system. The following case studies may help to illustrate these correlations.

### Family Support

"[Q]uality relationships with . . . family [and community] members deliver social support and enhance desistance." Cecilia Chouhy et al., *A Social Support Theory of Desistance*, 6 J. Dev. & Life-Course Criminology 204, 205 (2020). Family offers an important social network for men and women exiting prison, as many live with their family for at least several months. *See* Rosenfeld et al. (2022) at 87. Lack of such support may contribute to the recurrence and persistence of crime. Chouhy et al. (2020) at 205.

Of the 54 Study Population supervisees who were granted early termination, fully 51 supervisees (**94.4%**) reported having the strong support of family members. Successful supervisees often report and express gratitude for supportive family members in our supervised release hearings.

### Case Study #10

The supervisee was sentenced in 2017 to 36 months of incarceration followed by 5 years of supervised release for conspiracy to unlawfully engage in the business of dealing in firearms without a license, felon in possession of a firearm, and conspiracy to steal government funds. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began his supervision in 2020.

**Court**: This hearing follows our last supervised release hearing which took place on [date]. At that time we discussed supervision which was being conducted in [another state]. I think it was mentioned that there were mental health and substance abuse assessments made but treatment was not recommended. . . I was also advised that [supervisee] has completed the RDAP program while he was incarcerated.

**Probation Officer**: [Supervisee] has remained in compliance, and his family has been very supportive of his transition. His drug tests have been negative as far as substance abuse, and his housing situation is he is living at home with his wife and children . . . .

He is working on establishing a more dynamic family relationship with his child in New York. But unfortunately, due to the pandemic, he has not been able to travel up there, and they have not been able to travel down here without having to deal with quarantine issues . . . .

**Court**: [Supervisee], from your point of view, how is your life going . . .?

**Supervisee**: Family-wise, it's been great. I'm actually now a distributor for [company], which is a nutrition [company] . . . . I started as a regular trainer. Now I'm a distributor.

My son and my daughter are in it now. My daughter actually learned how to make the shakes and everything like that. So she's working the front desk. My son is actually doing Zumba classes, and I am a personal trainer there. . . . My son does Zumba classes from 6:00 to 7:00. I train from 7:00 to 8:00 [with] my daughter. . . .

But, I need to save some money and get rid of some bills that I had before. So my goal is to have my own [] nutritional place, fitness and nutritional place within like about a year. My wife of course is going to help us do the books and the accounting. So she'll keep the inside of the business going. I mean, I couldn't ask for nothing more.

<u>**Case Study #11**</u>

The supervisee was sentenced in 2012 to 65 months of incarceration followed by 5 years of supervised release for conspiracy to distribute and possess with intent to distribute cocaine. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began his supervision in 2016.

> **Court:** [T]his is our first . . . supervised release hearing in this matter. . . . Just by way of brief background, the supervised release segment of somebody's sentence . . . is intended to be very different than the period of incarceration, which is largely . . . punitive . . . . Here, in supervision, we're . . . concerned about the well-being of the [supervisee] and . . . there being a smooth integration . . . back into the community.

> **Probation Officer:** I'm happy to report to the Court that since the commencement of his supervised release term, [supervisee] has demonstrated a consistently positive adjustment to supervision. . . . All indicators from [supervisee's] counselor are that [he] has demonstrated a consistently positive adjustment to treatment, and all drug test results have been negative throughout the course of treatment as well as his supervised release term. He also maintains a stable residence with his supportive family . . . and he maintains full-time employment . . . deliver[ing] equipment to the company's various job sites. . . .

> He is blessed in that he has a very supportive family who has always been there for him, and I think that has helped aid him in his positive adjustment to supervision. And I would even describe him as a model supervised releasee. He really has, I mean, his level of diligence and dedication to remaining in compliance with all court-ordered directives, again, is commendable.

> **Court** [to supervisee]: Can you share with us how you approached supervision and how you found it, and candidly, how you were able and successful in completing the work that you've done so far?

> **Supervisee:** Coming out, knowing that I have to walk a straight line being under Judge Berman and especially my probation officer . . . which helped me tremendously, giving me positive feedback on how I was doing. Just seeing my kids grow up, I don't want to put myself in the situation again, and put my family . . . through this again. That just helped me a lot. My wife had helped me a lot, my family. So it's just very positive on me moving forward. . . .

> **Court:** So, your family stood by you for the whole period when you were incarcerated and after you came out?

**Supervisee:** Yes . . . . The support that my family have for me was tremendous[], everybody, every visit my family was there. My commissary was right. I didn't have no problems at all. I was able to sleep good and wake up good the next morning. So that, I really didn't have an issue, which a lot of other prisoners with stories that I heard and people that didn't have the support. But I really did have the support, and that was a great help for me.

## Housing

A significant challenge facing individuals exiting prison is finding stable, affordable housing. "Formerly incarcerated people are 10 times more likely than the general public to be homeless . . . ." Rosenfeld et al. (2022) at 84. And, formerly incarcerated people often live in unstable marginal housing situations, such as shelters, motels and rooming houses, and they move frequently in the first year or two after release. *Id.* at 85.

53 of our Study Population supervisees who were granted early termination (or **98.1%** of them) had stable housing during the period of supervision. The Court regularly inquires into the housing situation of supervisees.

### <u>Case Study #12</u>

The supervisee was sentenced in 2017 to 82 months of incarceration followed by 3 years of supervised release for possession of a stolen firearm. The conditions of his supervised release included weekly therapeutic counseling and participation in a substance abuse program. He began supervision in 2020.

**Court** [to Probation Officer]: Could you tell us from your point of view where things are, how things are going for [supervisee] . . . .

**Probation Officer:** [Supervisee] continues to work [part-time] as a home health aide and continues to reside with his grandmother.

**Therapist:** [S]ince we have been working together, [supervisee] expressed that his goal is to get a full-time well-paying job, as well as to be able to afford his own apartment. However, his motivation to do what he needs in order to achieve these goals had been somewhat inconsistent. . . .

Overall, he's been doing well. He's been staying out of trouble. He's been engaged in consequential thinking. He has been controlling his impulsivity and anger, which is great. And we will continue to explore barriers that prevent him from following through with his other goals.

**Supervisee**: I'm thinking about going into the shelter, Judge . . . . I really don't want to do it, but how am I going to get a crib?

**Court**: Why? Is [it] easier to get into an apartment [] through the shelter system? . . . Unless I am missing something, to me, I think you're in a better position now than going into a shelter.

**Probation Officer**: I personally do not think [supervisee] should enter the shelter system. I think he has the support of his grandmother; he has his aunt down the street; he has his father who is always there. And that is something that I think is keeping him on the straight and narrow. I fear that while he might be able to qualify for a voucher while in the shelter system, I think the negatives will outweigh the positives in that respect. If [supervisee] can secure full-time employment, he would be able to save his money and actually afford a room or a studio apartment, which I think will give him more satisfaction as well.

## Employment

Finding employment is another big concern for supervisees, many of whom leave prison with economic obligations such as restitution, debts associated with child support, fines, etc. *Id.* at 86. Research indicates that supervisees who are employed have a lower likelihood of post-release criminal offending. *See* Nathan W. Link et al., *Consequences of Mental and Physical Health for Reentry and Recidivism: Toward a Health-Based Model of Desistance*, 57 Criminology 544, 545 (2019).

50 of our Study Population supervisees who received early termination (or **92.6%**) had or obtained employment at some point during the period of supervision.

### Case Study #13

The supervisee was sentenced in 2012 to 95 months of incarceration followed by 5 years of supervised release for racketeering conspiracy and assault. The conditions of his supervised

release included participation in a substance abuse program and weekly therapeutic counseling.

He began supervision in 2019.

> **Court**: During [our last] hearing . . . there was a very positive picture painted of [supervisee]. He was working [in maintenance], going to treatment and it sounded like he was doing everything that he was asked to do. . . .
>
> **Probation Officer**: I am happy to report that [supervisee] has continued to abide by his conditions of supervision. In January he was able to move into his own apartment . . . where he still remains close to his mother. He continues to remain employed . . . . In regards to treatment, [supervisee] continues with his mental health sessions at [a mental health clinic]. . . .
>
> **Court**: That's great. . . . [I]f things continue to go well, there is no reason why we couldn't . . . [reduce] some of his supervision. It's called early termination. . . . [Supervisee], how is everything going from your point of view?
>
> **Supervisee**: Very good. . . . That means a lot, the early termination. . . . Everything is doing well. . . . I am working a lot. There is a lot of overtime offered. I am working nights and days. Getting home and trying to exercise. I have my routine down and it's great. . . .
>
> **Court**: Fantastic. Do you do the work . . . all over the City?
>
> **Supervisee**: I am mostly on the Lower East Side. . . . Sometimes we have to travel uptown and I don't mind as long as it is overtime, it's great. I am mostly down here, mostly in Manhattan.
>
> **Court**: Defense counsel, did you want to add anything?
>
> **Defense Counsel**: I agree with your Honor that it seems to me that [supervisee] is a very good candidate for early termination and hope to be in a position by the next [hearing] to address that more fulsomely.
>
> **Court**: How about the Assistant U.S. Attorney, did you want to add anything?
>
> **AUSA**: Nothing to add, your Honor. Although I share everyone's view that things are going well and certainly it seems like a case that [ ] early termination may be appropriate for a variety of reasons.

**Mental Health and Substance Abuse**

People exiting prison "often identify drug use as the primary cause of many of their past and current problems including family, relationship, employment, legal, or financial problems." Rosenfeld et al. (2022) at 90. And, studies have also found that incarceration is associated with the

onset of various mental health disorders, including major depressive disorder, bipolar disorder, and dysthymia. *See* Jason Schnittker et al., *Out and Down: Incarceration and Psychiatric Disorders*, 53 J. Health & Social Behav. 448, 450 (2012). Thus, "[a]ny long-term sustainable approach to public safety . . . must confront and address the role of mental illness and addiction." Craig Haney, Jennifer K. Johnson, Kathleen Lacey & Michael Romano, *Justice That Heals: Promoting Behavioral Health, Safeguarding the Public, and Ending Our Overreliance on Jails* at 15 (June 15, 2016).

Our court involved supervision program emphasizes the importance of treatment for mental health disorders, substance abuse, and co-occurring disorders. "[L]egal and clinical professionals, especially forensic psychiatrists, psychologists, lawyers, and social workers, serve a key role in detecting minor to serious mental illness and providing referrals to services." Tina Maschi & Dhweeja Dasarathy, *Aging with Mental Disorders in the Criminal Justice System: A Content Analysis of the Empirical Literature*, 63 Int'l J. Offender Therapy Compar. Criminology 2103, 2131 (2019).

Of the 54 Study Population supervisees who were granted early termination, 50 supervisees (or **92.6%**) received mental health counseling, and 43 supervisees (or **79.6%**) received substance abuse treatment. At the beginning of supervision, mental health counseling and substance abuse treatment typically occur weekly. Integrated treatment, *i.e.*, treatment "within a coordinated system [that] allows providers to modify as well as combine the treatments for both disorders," is enormously helpful. *See* Sara Gordon, *About a Revolution: Toward Integrated Treatment in Drug and Mental Health Courts*, 97 N.C. L. Rev. 355, 381 (2019).

## Case Study #14

The supervisee was sentenced in 2016 to 60 months of incarceration followed by 5 years of supervised release for narcotics conspiracy. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2019.

> **Court:** [At] the last hearing . . . we had [supervisee's drug and mental health counselor], and I understand she's present with us again today. And she was . . . [conducting] weekly counseling sessions, including anger management and substance abuse treatment. . . . [Supervisee] continued to be employed at his cousin's auto body shop in the Bronx. . . . [M]y own impression was at the last hearing . . . [supervisee] was doing very well and was compliant . . . . [P]robation said they they were proud of [supervisee], particularly his ready contact . . . and good relationship between him and the probation officer. . . .
>
> **Probation Officer:** He is extremely compliant. He reports to the probation department whenever directed. He communicates very well with me. He responds to all text messages and phone calls, and our last meeting, he was very pleasant because it was one where he was a little more forthcoming . . . .
>
> **Therapist:** We've discussed some of the triggers in his environment and discussed with him . . . managing those triggers and alternatives to . . . medicating his feelings. . . .
>
> [H]e has the information. We've gone through anger management . . . and he's very aware of techniques to be able to manage his anger. I think it's an environmental thing, you know, the environment he lives in, the environment he works in. . . .
>
> As far as [mental health counseling] is concerned, I think that he does come and he discusses what's going on in his environment. . . . [H]e's supposed to come see me once a week. I think that that could be reduced to maybe twice a month . . . . He's been here since September of last year, and sometimes therapy fatigue sets in . . . .[15]
>
> **Supervisee:** That's cool. I'll see her twice a month. . . . [E]very time I talk to my [therapist], I feel better. So I don't want to give that up and get off

---

[15] The Court is aware that overprogramming supervisees may be counterproductive. *See* Edward J. Latessa & Angela K. Reitler, *What Works in Reducing Recidivism and How Does it Relate to Drug Courts*, 41 Ohio N.U. L. Rev. 757, 760 (2015) ("[I]ntensive treatment and services for lower risk offenders can often increase recidivism rates.").

track; you know what I'm saying? Like, I want to keep a little structure going.

**Therapist:** I agree. . . . I think that [therapy] has been beneficial . . . . [T]he focus would be more on . . . his environmental issues, his daily living, managing his emotions or anything that comes up . . . .

**Physical Health**

In general, "formerly incarcerated individuals have an elevated risk of experiencing a diverse set of chronic health conditions compared with the general population." Rosenfeld et al. (2022) at 90. In one study, "almost half of men [exiting prison] reported having a chronic physical health condition; the most commonly reported conditions were asthma, hepatitis, and high blood pressure." *Id.*

A number of our Study Population supervisees suffer from chronic health conditions, and the Court addresses physical health during supervised release hearings to ensure that supervisees receive necessary treatment.

**Case Study #15**

The supervisee was sentenced in 2011 to 46 months of incarceration followed by 3 years of supervised release for racketeering conspiracy and assault. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2015.

**Court:** We were last together [in] April. . . . As we did then, why don't we hear today from probation first [to see] how things are going?

**Probation Officer:** Everything with [supervisee] has been consistent. He's been consistently working . . . . His home is stable. He still is residing in [New York City] with his girlfriend.

**Court** [to supervisee]: you said you had . . . some medical issues, last time. How are you doing in that regard?

**Supervisee:** Actually, doing a lot better, thank God. I actually got hurt on the job a few months back. Something went on with my hip. I had some x-rays done. My left hip was about four inches higher than my right hip. I had to stay out of work for about three weeks. I got back to work as soon as I

45

could, went back to work. Got hurt again. I had a container fall on my foot. Thank God, nothing broke. Went back to work again. And that's basically how it's going workwise. I'm doing pretty well with that. They've got me on some pretty wild hours, but I do what I have to. And, basically, everything else is up to par.

**Court:** [W]e discussed last time that we would talk about terminating supervised release early if things were going well. What does probation and the government think about that?

**Probation Officer:** Probation has no objections based on his compliance with supervision.

**AUSA:** The government defers to probation.

### Case Study #16

The supervisee was sentenced in 2021 to 4 months and 6 days of incarceration followed by 3 years of supervised release for narcotics conspiracy. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling. He began supervision in 2021.

> **Probation Officer:** [Supervisee's] methadone maintenance [is] increasing . . . His medical condition . . . has actually worsened. He has been going to the doctor multiple times throughout the month. . . . I'm also exploring the idea of perhaps revisiting residential treatment referral. But with his medical condition worsening, it will be very, very difficult to even explore that route . . . .
>
> **Court** [to supervisee]: [H]ow are you feeling physically?
>
> **Supervisee:** I'm having some issues. My health is . . . still bad, it's getting worse. My pancreas, my levels, the doctors are trying to adjust everything, so I'm going back and forth. They give me a new medication. It has me feeling kind of lethargic, but other than that, you know, still putting one foot in front of the other. . . .
>
> I need to get this operation . . . . So I don't have a lot of time. [The doctor] is going to re-examine me and then he's going to schedule the date. But when he [does] that, he's going to come back and make sure that I'm not smoking cigarettes and that I'm stabilized.
>
> **Court:** Will they operate if you're on methadone?
>
> **Supervisee:** No. . . . I can't have drugs in my system, and I can't have nicotine in my system.

### VIII.    Magistrate Judge Sarah L. Cave on Court Involved Supervised Release

We have begun to develop ways to scale up court involvement in supervised release, *i.e.*, to encourage judges to become more involved in supervised release. Recently, SDNY Magistrate Judge Sarah L. Cave approached me about becoming involved in our program. I jumped at the opportunity. Magistrate Judge Cave offers her thoughts on her experience with court involved supervised release, as follows:

In October 2021, I attended a webinar entitled, "How Judges Can Make a Difference in the Success of Supervised Release."[16] The Hon. Richard M. Berman, United States District Judge for the Southern District of New York and the Hon. L. Felipe Restrepo, United States Circuit Judge for the United States Court of Appeals for the Third Circuit, described their judicial programs overseeing federal criminal defendants' reentry into society after completion of their prison sentences. Judge Berman described his individual court's intensive supervised release project, and Judge Restrepo described his pioneering work developing the Supervision to Aid Reentry (STAR) court in Philadelphia, which was created in 2007.

Inspired by the discussion of judges' involvement in actively overseeing supervised release and the defendants' resulting success in meeting their release conditions, Judge Berman and I discussed how I, as a SDNY Magistrate Judge, might participate in his supervised release program. Thus began a dialogue over the next several months, culminating in Judge Berman referring to me in February 2022 five supervisees whose supervised release hearings I would oversee. Since then, we have conducted three rounds of supervised release hearings in those cases. Judge Berman

---

[16] The webinar was sponsored by The Regulatory Review, the Penn Program on Regulation at the University of Pennsylvania Carey Law School, and the Quattrone Center for the Fair Administration of Justice.

subsequently referred an additional ten defendants—bringing the referred cases to 15—for whom, by the end of September 2022, we will have conducted at least one supervised release hearing.

Despite not having met me during earlier court proceedings, the supervisees have been very open and candid with me about their mental health, drug use, housing, employment, and other personal circumstances. At least two of the defendants whom I am helping to supervise appear to be potential candidates for early termination. With hard work and determination, these supervisees have materially improved their own lives and those of their families.

Some supervisees found compliance with the conditions of their release, particularly mental health and substance abuse treatment, to be somewhat of a struggle. These supervisees, who tend to have fewer resources, less stable housing, and minimal, if any, family support, have worked hard to remain in compliance, in large part due to the strong support of the Court and of their SDNY Probation Officers. These supervisees also appear to benefit from regular interaction with the Court, and have shown dedication, if not always straight-line improvement, from hearing to hearing.

Three supervisees have been rearrested and charged with state crimes. Depending upon how their state cases are resolved, they may face the prospect of sentencing by Judge Berman for probation violations. We will continue to work with them and to employ more frequent hearings and other supervision techniques to help turn things around.

I am confident that court-involved supervision helps appreciably to reduce the odds of return to crime. Oversight of supervisees has been a rewarding undertaking and a privilege. I believe it is perhaps the most significant and consequential work judges can undertake, and I hope other judges will join us in this important work. The willingness of the supervisees to be open about their achievements as well as their struggles is key to their success. And, the judge's

48

willingness to listen, to be available, to offer suggestions, to help plan a course of action, and to encourage and spend the time to involve themselves in supervision is vitally important to building relationships of trust with the supervisees and a framework for safe and successful reentry.

## IX.    Conclusion

For many (perhaps most) federal defendants, supervised release is the last best chance to safely and effectively reenter the community. Some supervisees are repeat offenders, some with co-occurring disorders of drug addiction and mental illness, and some are likely to continue to offend absent the courts' intervention. **Supervision, in my view, must become an integral role and responsibility of the judge who took the defendant's plea (or presided at his trial) and imposed his sentence. And, here, time is of the essence.** Often, many judges never see the defendant after imposing the sentence unless the defendant gets into trouble during supervision. And then, the judge's principal involvement is often to reincarcerate.

On the other hand, judges who do take a more active role in supervision can utilize the authority of their position and their experience to effect stunning pro community outcomes. **"[J]udges, working in tandem with support staff and key actors in the criminal justice system [such as probation officers] . . . may have a unique opportunity to enhance an ex-offender's prospects of permanent reintegration into the community by actively participating in programs that 'go beyond' punishment."** Marvin L. Astrada, *Reentry Philosophies, Approaches, and Challenges*, 102 Judicature 2, 39 (Summer 2018).

I would be happy to answer any questions you might have.

**Richard M. Berman**
**(212) 805-6715**